Cathy A. CRAWLEY, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A05–0905–CR–280.

Court of Appeals of Indiana.

Feb. 9, 2010.

Kevin Wild, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Angela N. Sanchez, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Cathy Crawley appeals her conviction for Class C felony operating a motor vehicle after driving privileges are forfeited for life. Although nobody witnessed Crawley operate the motor vehicle, we conclude that the State presented sufficient circumstantial evidence from which the trier of fact could conclude beyond a reasonable doubt that Crawley operated the motor vehicle. We therefore affirm her conviction.

### Facts and Procedural History

The evidence most favorable to the judgment reveals that Donald Jones had a tiki bar in the backyard of his southeast Indianapolis home, which served as a hangout for many of his friends. Crawley dated Jones' friend, Jason Clark, and as a result of this relationship, she visited Jones' house several times to hang out. After Crawley and Clark stopped dating, Crawley still visited Jones' house on a few occasions. After Crawley came to Jones' house with some people that Jones did not know, Jones told Crawley that she could only come to his house with Clark or another man, Dave Beman.

Around 4:30 or 5:00 a.m. on November 26, 2008, which was the day before Thanksgiving, Jones' live-in girlfriend woke him up because she heard a sound in the backyard. Jones got dressed and went to the back door. When Jones opened the door, he saw Crawley standing there "soaking wet" wearing boxer shorts, a tank top, and no shoes. Tr. p. 11. Jones was "very shocked" to see Crawley, whom he considered an acquaintance, because he had not seen her in four to six weeks and there was no party at his house the previous night. *Id.* Jones then looked over and noticed that his Jacuzzi was running. Jones asked Crawley what she was doing and who she was with, but Crawley did not respond. Jones repeated his inquiry, and Crawley asked, "Do you know where my car's at?" *Id.* at 13. Jones said no, wondering if this was a guessing game or a bet. After checking one of the driveways which flanked Jones' house, Crawley again asked, "Do you know where my car's at?" *Id.* Again, Jones said no. After running to Jones' other driveway, Crawley returned to Jones and said, "I think my car's in your pool." *Id.* Jones responded, "You gotta be kidding me." *Id.* Jones then turned on his flood lights and saw a car backed into his pool. State's Ex. 1, 2. Jones had an above-ground pool that was dug three feet into the ground and surrounded by a recently-constructed wooden deck. The pool was partially drained for the winter. Jones was "very upset" about the car in his pool. Tr. p. 13.

Jones brought Crawley into his house and instructed his girlfriend to retrieve some dry clothes for her. In the meantime, Jones inspected the Jacuzzi area and found Crawley's jacket, her purse, and

four cigarette butts. Strangely, there were no shoes or pants. Once Crawley had dry clothes on, they sat down at the kitchen table, and Jones began asking Crawley questions, including why she was there and who she was with. When Crawley responded that she was there with Clark, Jones knew that to be untrue because Clark, one of Jones' best friends, was in Michigan. So, Jones again asked Crawley if she was there with anybody else, and this time she said no. Because Crawley could barely walk and kept almost falling out of her chair, Jones believed that she had consumed alcohol. Also, Crawley said she took five or six Klonopin. Jones then asked Crawley whose car it was. Jones proceeded to the car and discovered that it was registered to Tim Siddons. Jones asked Crawley for Siddons' phone number, and Crawley gave it to him. Siddons was at work, so Jones left a message for him. When Jones told Crawley that he was going to call the police because of the extensive damage to his property, Crawley asked him not to do so, promising that Siddons' insurance would pay for it. Crawley, who lived with her father at the time, then gave Jones her father's telephone number.

Jones called Crawley's father, Jere Crawley. Crawley got on the phone to talk to her father and asked him if it was day or night. When Jere arrived to pick up Crawley, she was "[p]retty confused." *Id.* at 52. While Crawley was waiting in her father's truck, Jones showed Jere the damage to his pool and said that unless Jere wanted to assume responsibility for the damage, he was going to call the police. Jere said, "I guess you got to do what you got to do." *Id.* at 24. Jones called the police after Jere and Crawley left.

Indianapolis Metropolitan Police Department Officer Kevin Joyce arrived at Jones' house around 7:15 a.m. and observed a "Chevrolet Cavalier partially submerged in a partially above ground swimming pool." *Id.* at 30. Officer Joyce then looked inside the purse which was located next to the Jacuzzi and found an identification card belonging to Crawley. Officer Joyce ran a BMV check on Crawley, which revealed that she was a Habitual Traffic Offender for Life. Officer Joyce then contacted the owner of the vehicle, Siddons, who stated that he had given Crawley his car approximately three weeks ago because she needed transportation to work and a way to get her daughter; however, she had refused to return his car. Officer Joyce then went to Crawley's house and arrested her. At the time of her arrest, Crawley's hair was still wet, her gait was unsteady, her speech was slurred, and her eyes were bloodshot.

The State charged Crawley with Class C felony operating a motor vehicle after driving privileges are forfeited for life. A bench trial was held, during which Crawley presented the testimony of her friend, Elizabeth Frazier. Frazier testified that she was with Crawley "right before Thanksgiving." *Id.* at 72. Frazier said that Crawley came over to her house around midnight with a man she did not know, had a few drinks, and left around 5:00 or 5:15 a.m. *Id.* at 64, 65. When Crawley left, she was "[t]ired and sluggish." *Id.* at 72. According to Crawley, the man was "definitely" in the driver's seat of the car when they left. *Id.* at 64. The trial court found Crawley guilty as charged. The court reasoned:

> It's fairly clear to me that the defendant had the car in her possession.... With regard to who drove the car it comes down to whether or not I can believe what [Jones] says that you told him [that she was alone at his house] or Ms. Frazier who just testified. And there were a couple things about Ms. Frazier's

testimony that bothered me. One, she was really sure that it was about five or five-fifteen when she was waving good-bye to you holding her cat, however, the testimony was that it was four thirty or five that this was all happening at [Jones'] house. Now, she could have been wrong about that but she was pretty adamant in her testimony about that. She also, I think she was trying to be really helpful but I don't think she really has any idea what day it was that you were there with this person whose name she didn't know where you were there all night long because when I asked her how she knew the date she said she didn't really know the date, she said that she didn't find out about it for some time until later, some friends called and told her what happened and so basically, after she was questioned on cross and re-direct about that on my question, it became the very next day but I don't really think that was it. I don't think she really knows what day it was, you know, I think it was probably habit that you were there spending the night with her and there were, since it happened on many occasions, probably difficult for her to figure out which day particularly it was that this happened. I don't know, just wasn't, it was pretty clear to me that she was trying to be helpful with regard to what day it was. She did say she knew for sure it was a couple days before Thanksgiving which I don't think necessarily fits with the facts as they're presented. The thing I think is the most telling of circumstantial evidence for me is that your purse was wet. Officer testified that the purse was wet. There was testimony that you were soaking wet. Now that could have been from getting into a Jacuzzi but even a pretty intoxicated person wouldn't get in a Jacuzzi with their purse, however, if they were backing out and backed into the pool and had to get out of the car it would be natural to take the purse and to me, that circumstantial evidence points ... surely and unerringly to the fact that you were the driver of the car that day.

*Id.* at 83–85. The trial court sentenced Crawley to four years with two years suspended to probation. Crawley now appeals.

### Discussion and Decision

██ Crawley contends that the evidence is insufficient to support her conviction. When reviewing the sufficiency of the evidence, appellate courts must only consider the probative evidence and reasonable inferences supporting the judgment. *Drane v. State,* 867 N.E.2d 144, 146 (Ind.2007). It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient. *Id.* To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it "most favorably to the trial court's ruling." *Id.* Appellate courts affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* at 146–47 (quotation omitted). It is therefore not necessary that the evidence "overcome every reasonable hypothesis of innocence." *Id.* at 147 (quotation omitted). "[T]he evidence is sufficient if an inference may reasonably be drawn from it to support the [judgment]." *Id.* (quotation omitted). A conviction may be based upon circumstantial evidence alone. *Fought v. State,* 898 N.E.2d 447, 450 (Ind.Ct.App. 2008). Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense. *Id.*

In order to convict Crawley of Class C felony operating a motor vehicle after driv-

ing privileges are forfeited for life as charged here, the State had to prove that on or about November 26, 2008, she operated a motor vehicle at 5400 South Keystone Avenue after her driving privileges were forfeited for life under Indiana Code sections 9–12–3–1 (repealed 1991), 9–4–13–4 (repealed 1984), or 9–30–10–16. Ind. Code § 9–30–10–17; Appellant's App. p. 33. The only element Crawley challenges on appeal is operation of the motor vehicle. She relies heavily on the fact that no one observed her operating the motor vehicle that was found backed into Jones' pool.

Because there is no statutory definition of the verb "operate" used in Indiana Code section 9–30–10–17, we deduce its meaning from the definition of "operator." *Hampton v. State*, 681 N.E.2d 250, 251 (Ind.Ct. App.1997). According to Indiana Code section 9–13–2–118(a)(1), the "operator" of a motor vehicle is "a person ... who ... drives or is in actual physical control of a motor vehicle upon a highway...." Thus, to operate a vehicle is to drive it or be in actual physical control of it upon a highway. *Hampton*, 681 N.E.2d at 251. A public highway is a "street, an alley, a road, a highway, or a thoroughfare ... that is used ... or open to use by the public." Ind.Code § 9–25–2–4.

■ Several factors may be examined to determine whether a defendant has "operated" a vehicle: (1) the location of the vehicle when it is discovered; (2) whether the car was moving when discovered; (3) any additional evidence indicating that the defendant was observed operating the vehicle before he or she was discovered; and (4) the position of the automatic transmission. *Hampton*, 681 N.E.2d at 251. In addition to these four factors, "[a]ny evidence that leads to a reasonable inference should be considered." *Id.*

We find it to be of no moment that nobody observed Crawley operate the mo-

tor vehicle because the State presented sufficient circumstantial evidence from which the trier of fact could conclude beyond a reasonable doubt that Crawley operated the motor vehicle. Crawley borrowed the car from its owner, Siddons, a few weeks before the accident and had not yet returned it. On the morning of November 26, the car was backed into Jones' partially buried above-ground pool. The driver side of the car was in the water but the passenger side was not. *See* State's Ex. 1, 2. The car had plowed through the wooden deck before coming to rest in the pool. *See id.* After the accident, Jones found Crawley at his back door soaking wet wearing boxer shorts, a tank top, and no shoes. Jones then glanced over and saw that his Jacuzzi was running. Puzzled, Jones asked Crawley, an acquaintance he had not seen in four to six weeks, what she was doing and who she was with. Crawley did not respond. Crawley then twice asked, "Do you know where *my* car's at?" Tr. p. 13 (emphasis added). After Crawley unsuccessfully checked both of Jones' driveways for her car, Crawley told Jones that she thought her car was in his pool. Jones turned on his floodlight and saw Crawley's car in his pool. Jones checked the Jacuzzi area and found Crawley's purse, jacket, and four cigarette butts; however, he found no evidence that anybody else had been there. After Crawley put some dry clothes on, they sat down at Jones' kitchen table, and Jones began asking Crawley questions. Crawley said she was there with her ex-boyfriend Clark, but Jones immediately knew that was not the case because Clark was in Michigan. Jones then asked Crawley if she was there with anybody else, and Crawley said "no." *Id.* at 20. Jones thought Crawley was intoxicated because she had a hard time walking and staying in her chair, and Crawley admitted taking five or six Klono-

pin. When Jones told Crawley he was going to call the police, she asked him not to do so and claimed that Siddons' insurance would pay for the damage. She also asked Jones to call her father and provided his telephone number.

The evidence that Crawley possessed the car, was present at the scene, was highly impaired, made statements to Jones that no one was with her, and made efforts to avoid the police being summoned is sufficient to prove that Crawley operated the car. Nevertheless, Crawley contends that the evidence is insufficient to support her conviction. As shown below, though, Crawley's arguments merely amount to invitations to reweigh the evidence or the credibility of the witnesses.

Crawley first argues that she was too intoxicated at the time she made the statement that nobody was with her and therefore the statement was not reliable and cannot be used against her. Although there is indeed evidence that Crawley was intoxicated, it is also true that Crawley navigated Jones' yard looking for her car, lied about who she was with, provided not only her telephone number but also Siddons' number, and had enough sense to try and persuade Jones not to call the police. This is a classic request to reweigh the evidence and reassess Crawley's credibility, which we will not do.

Next, Crawley points to inconsistencies among Frazier's testimony, Jones' testimony, and the probable cause affidavit concerning the time that the accident occurred. Initially, we note that the probable cause affidavit was not evidence in this case and therefore cannot be considered on appeal. As to the discrepancies between Frazier's and Jones' testimony, the trial court explicitly chose to believe Jones. This is a credibility determination that we will not disturb on appeal.

Next, Crawley challenges the trial court's discrediting of Frazier's testimony regarding the date when Crawley was at her house with the unknown person. Again, this qualifies as a request to reweigh Frazier's credibility, which we will not do. But even if we credited Frazier's testimony that Crawley—merely tired and sluggish—left Frazier's house early in the morning on November 26 with this unknown person driving, Crawley's circumstances substantially changed between the time that Frazier last saw her and Jones found her in his backyard alone, barefoot, pantless, and so impaired that she had difficulty sitting upright.

Finally, Crawley challenges the substantial weight that the trial court placed on the fact that water was found in Crawley's purse and the inference that the court drew from this—that the water had to come from the pool, not the Jacuzzi, and therefore Crawley was the one who drove the car into the pool. Crawley asserts that this inference is "not logical and reasonable." Appellant's Br. p. 14. The record reveals that Officer Joyce found Crawley's purse next to the Jacuzzi, not in it.[1] In addition, State's Exhibits 1 and 2 show that the passenger side of the car did not enter the pool, only the driver side did. Although the pool was not full of water, it did contain a substantial amount of water despite the fact that the car collapsed the sidewalls of the pool. Therefore, a person exiting the driver side of the car would be forced to step into some water. As such, the trial court's inference that Crawley's purse was wet because she drove the car was reasonable and will not be disturbed on appeal.

1. Again, Crawley wrongfully relies on the probable cause affidavit.

When taken as a whole, the substantial circumstantial evidence supports the trial court's inference that Crawley operated the car, ultimately driving it into Jones' pool. Shortly after the accident, Crawley was found alone and seriously impaired at the scene. Multiple times she referred to the motor vehicle as "my car." She initially lied about who she was with but eventually admitted to being alone, and she attempted to evade contact with the police. We therefore affirm Crawley's conviction for operating a motor vehicle after driving privileges are forfeited for life.

Affirmed.

CRONE, J., concurs.

RILEY, J., dissents with separate opinion.

RILEY, Judge, dissenting.

I respectfully dissent. The majority makes light of the fact that no eye witness ever placed Crawley in the driver's seat of the car. Appellate cases dealing with the sufficiency of the evidence to prove operation of a vehicle usually include fact patterns where a witness has found the defendant in the driver's seat of the vehicle alleged to have been operated. *See, e.g., Parks v. State,* 752 N.E.2d 63 (Ind.Ct.App. 2001); *Clark v. State,* 611 N.E.2d 181 (Ind. Ct.App.1993), *trans. denied; Hiegel v. State,* 538 N.E.2d 265 (Ind.Ct.App.1989). Indeed, "where the defendant has been found asleep with the engine running and the car is parked in a parking lot, this court has held that the evidence is not sufficient to show the defendant has oper-

ated the vehicle." *Clark,* 611 N.E.2d at 181.

More recently, we have considered the sufficiency of the evidence to prove operation where the defendant was found outside of the vehicle alleged to have been operated; however, that was in the context of an interlocutory appeal disputing whether there was probable cause for the purpose of a search. *Copas v. State,* 891 N.E.2d 663 (Ind.Ct.App.2008). The defendant had been found unresponsive lying outside of a vehicle that had been in a serious collision, on the driver's side of that vehicle. *Id.* at 665. No other person was found at the scene that could have been a driver or passenger of the vehicle, and we concluded that this was sufficient to establish a "fair probability" that she had operated the vehicle, but carefully distinguished the lower threshold required to establish probable cause compared to guilt beyond a reasonable doubt. *Id.* at 668.

I believe that the evidence, taken together, creates a probability that Crawley operated the vehicle, but this probability is less than beyond a reasonable doubt. Although we often state that it is not our function to reweigh the evidence, when we compare the evidence presented by the State here to the evidence in *Parks, Clark,* and *Hiegel* it is a break from our precedent to affirm Crawley's conviction.