## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 19 2017, 10:03 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Darren Bedwell
Marion County Public Defender
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. Mackenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

David Garden,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 19, 2017

Court of Appeals Case No.
49A02-1606-CR-1337

Appeal from the Marion Superior Court

The Honorable Marc T. Rothenberg, Judge

Trial Court Cause No.
49G02-1405-FC-26051

**Bradford, Judge.**

# Case Summary

[1] Appellant-Defendant David Garden engaged in a series of fraudulent real estate transactions from approximately 2010 until 2014. In May of 2014, Garden was charged with twenty-seven felony counts. The first count alleged that Garden had committed acts supporting a pattern of racketeering activity by means of forgery and theft. The others alleged that Garden had committed numerous forgeries and thefts. One of the theft charges was dismissed prior to trial. Garden's remaining charges consisted of one count of Class C felony corrupt business influence, eleven counts of Class C felony forgery, and fourteen counts of Class D felony theft.

[2] The case was tried before a jury on April 4, 2016. Appellee-Plaintiff the State of Indiana ("the State") dismissed one theft count following the presentation of the evidence, and the jury found Garden not guilty of three other theft counts. The jury found Garden guilty of each of the remaining twenty-two counts. The trial court subsequently sentenced Garden to an aggregate term of twenty-four years, with three years executed in the Department of Correction ("DOC"), three years executed in community corrections, eighteen years suspended, and eight years and five days served on probation.

[3] On appeal, Garden challenges the sufficiency of the evidence to sustain six of his convictions for Class C felony forgery. Finding that the evidence is sufficient to sustain the challenged convictions, we affirm.

# Facts and Procedural History[1]

From approximately 2010 through 2014, Garden engaged in a series of fraudulent real estate transactions. In some cases, Garden would offer to sell a home for an individual, obtain a quitclaim deed for the property, and then enter into a rent-to-own agreement with a subsequent victim that was contrary to the authority given to him by the original owner. In other cases, Garden would get his victims to sign rental agreements or lease- or rent-to-own agreements on properties where either (1) he did not have the authority to make said agreement or (2) where rental was ultimately not feasible. Once the rental agreements relating to these properties fell through, Garden would not return any funds paid by his victims in compliance with the agreements.

On May 19, 2014, the State charged Garden with twenty-seven felony counts, alleging under Count I that Garden had committed acts supporting a pattern of racketeering activity by means of forgery and theft. The additional twenty-six counts alleged that Garden had committed numerous forgeries and thefts. The State subsequently dismissed Count Twenty-two, which alleged that Garden had committed Class D felony theft. Garden's remaining charges consisted of

---

[1] We note that because Garden was charged with and convicted of such a large number of crimes, it would be a burden to the reader to include facts relating to the unchallenged convictions in the instant appeal. In addition, it seems most helpful to the reader to provide only general facts and the case's procedural history in this section. Specific facts relating to the challenged convictions will be included in the Discussion and Decision section below.

one count of Class C felony corrupt business influence, eleven counts of Class C felony forgery, and fourteen counts of Class D felony theft.

[6] The matter proceeded to an April 4, 2016 jury trial. Following the presentation of the evidence, the State dismissed Count Nineteen, which alleged that Garden had committed Class D felony theft. The jury subsequently found Garden not guilty of Counts Ten, Twelve, and Seventeen, all of which alleged that Garden had committed Class D felony theft. The jury found Garden guilty of each of the remaining twenty-two counts. On May 25, 2016, the trial court sentenced Garden to an aggregate term of twenty-four years, with three years executed in the DOC, three years executed in community corrections, eighteen years suspended, and eight years and five days served on probation. This appeal follows.

# Discussion and Decision

[7] Garden contends that the evidence is insufficient to sustain six of his convictions for Class C felony forgery. Specifically, Garden challenges the sufficiency of the evidence to sustain his forgery convictions under Counts Six, Eleven, Fifteen, Sixteen, Eighteen, and Twenty-four.[2]

---

[2] The "Statement of the Issues" portion of Garden's Appellant's brief also indicates that Garden is challenging the sufficiency of the evidence to sustain Count 8. However, Garden presents no argument in relation to Count 8. As such, any challenge to Count 8 is waived. *See Hollowell v. State*, 707 N.E.2d 1014, 1025 (Ind. Ct. App. 1999).

When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (citations, emphasis, and quotations omitted). "In essence, we assess only whether the verdict *could* be reached based on reasonable inferences that may be drawn from the evidence presented." *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (emphasis in original). Upon review, appellate courts do not reweigh the evidence or assess the credibility of the witnesses. *Stewart v. State*, 768 N.E.2d 433, 435 (Ind. 2002).

[8] At the time Garden committed the charged offenses, Indiana Code section 35-43-5-2(b) provided that "[a] person who, with intent to defraud, makes, utters, or possesses a written instrument in such a manner that it purports to have been made: (1) by another person; (2) at another time; (3) with different provisions; or (4) by authority of one who did not give authority; commits forgery, a Class

C felony." In interpreting this statute, the Indiana Supreme Court held as follows:

> We think that the express language of our current forgery statute makes it clear that our legislature intended to extend the common law offense of forgery to include crimes never before deemed to be within the scope of the offense. This has been done by shifting the focus from the "false making" of things that may be forged to the means whereby forgery may be accomplished. As our Court of Appeals stated in *Bowman v. State* (1979), Ind. App., 398 N.E.2d 1306, 1309, "[w]e believe that in keeping with the intent and spirit and the express wording of the new criminal code, and specifically the forgery section, that in addition to the old definitions of forgery, forgery includes every act which fraudulently makes an instrument appear what it is not."

> Our application of the forgery statute is also aided by the broad definitions contained within the Code. "'Utter' means to issue, authenticate, transfer, publish, deliver, sell, transmit, *present*, or use." Ind. Code § 35-41-1-2 (emphasis added). "'Make' means to draw, prepare, *complete*, or alter any written instrument in whole or in part." Ind. Code § 35-43-5-1 (emphasis added). "'Written instrument' means a paper, document, or other instrument containing written matter and includes ... other objects or symbols of value, right, privilege, or identification." *Id*.

*Jordan v. State*, 502 N.E.2d 910, 913 (Ind. 1987).

## A. Facts and Analysis Relating to Count Eleven

[9] In 2000, Kenneth McCalep purchased a home located at 2002 South Wagner Lane in Indianapolis (the "Wagner property"). In 2011, McCalep was having

problems paying his mortgage when he came into contact with Garden. Garden told McCalep that he could help McCalep sell the Wagner property.

[10] McCalep ultimately decided to work with Garden to sell the Wagner property. In order to do so, McCalep signed the following documents at Garden's direction: (1) a Listing Contract, (2) a Quitclaim Deed indicating that the Wagner property was being sold to Garden for $100.00 in consideration, and (3) a Buyer's Exclusive Agency Contract. McCalep discussed these forms with Garden at the time each form was executed. Each time, Garden indicated that the forms were "whatever you fill out when you try to sell your home or put it on the market as listed.… Basically, something that [was] needed to put the house on the market [and for Garden] to try to sell it for [McCalep]." Tr. Vol. II, p. 391.

[11] Some time later, Garden informed McCalep that he needed to vacate the Wagner property as part of the selling process. McCalep and his family moved to another location. At some point after he had moved out of the Wagner property, McCalep was informed by relatives that there were other persons living in the Wagner property. McCalep was surprised because Garden had not informed him that he had sold the Wagner property and McCalep had not given permission for anyone to move into the Wagner property. McCalep then reached out to Garden and the following conversation took place:

> Well, I told him that at that time I thought that he was going to
> just sell the house so I could try to get it sold. And then a
> conversation struck up that he said something in regards to that

Quitclaim Deed that he had presented to me and that I had sold the house to him and I no longer owned the house and he could do whatever he wanted to with it.

Tr. Vol. II, p. 394. McCalep never received any rent money from Garden or from the individuals who had moved into the Wagner property.

[12] After contacting law enforcement, McCalep eventually regained possession of the Wagner property. Upon regaining possession, McCalep observed the following:

> The plumbing was all messed up. The electrical -- I had an alarm system in there. It was totally disassembled. My air conditioner unit was stolen. The furnace was stripped out. Feces all over the floor, carpet burnt. It was all that kind of stuff.

Tr. Vol. II, p. 398.

[13] The State subsequently alleged that Garden "on or about October 27, 2011, did, with intent to defraud, make a written instrument, that is: a document entitled Quitclaim Deed … in such a manner that said instrument purported to have been made by the authority of Kenneth McCalep, who did not give authority[.]" Appellant's App. Vol. II, pp. 108-09. Following trial, the jury found that the evidence was sufficient to prove the allegations set forth above.

[14] Review of the record reveals that Garden obtained McCalep's signature on the quitclaim deed through fraud. Garden obtained McCalep's signature on the deed under the pretense that he was going to sell the Wagner property for McCalep—which was the only authority that McCalep understood himself to

be granting to Garden by signing the document. McCalep neither understood that he was signing a document which would transfer his ownership of the property nor did he intend to do so.

[15] By deceiving McCalep in this way, Garden made the Quitclaim Deed appear to be something which it was not. Again, the Indiana Supreme Court has held that forgery "includes every act which fraudulently makes an instrument appear what it is not." *Jordan*, 502 N.E.2d at 913. Thus, because Garden used fraudulent means to obtain McCalep's signature on the Quitclaim Deed, Garden's conduct falls within the purview of the forgery statute. The evidence, therefore, is sufficient to sustain Garden's conviction under Count Eleven.

## B. Facts and Analysis Relating to Counts Fifteen and Sixteen

[16] In 1996, Anthony Pope purchased a home located at 2467 Finley Avenue in Indianapolis (the "Finley property"). Garden had assisted Pope in purchasing the Finley property, so Pope decided to talk to Garden when he decided to sell the property in 2012. Pope indicated that he wanted to sell the Finley property and did not want to lease it out. Garden gave Pope four documents to sign but did not explain what any of the documents were. Pope did not inquire about the documents because he "went to [Garden] in trust" based on their prior relationship. Tr. Vol. II, p. 500. Pope understood that he "had papers to sign" so he signed the papers that Garden "put in front of [him]." Tr. Vol. II, p. 500. Pope ultimately signed the following documents at Garden's direction: (1) a Quitclaim Deed indicating that the Finley property was being sold to Garden for $1.00 in consideration, (2) a Listing Contract granting Garden the exclusive

right to sell the Finley property, (3) a Purchase agreement indicating that the property would be sold to April Brooks and Gary Jones Jr. for $44,900.00 with $1.00 in earnest money, and (4) a Short Sale Addendum to the Listing Contact. Garden did not give Pope any money in connection to the Finley property.

[17] Following the execution of these documents, Pope learned that someone was living at the Finley property. Pope drove past the property and observed damage to the garage door and a window. When Pope questioned Garden about this fact, Garden indicated that he had buyers lined up and that the persons living at the Finley property were the persons who were going to purchase it. Pope indicated that he felt that he had been "misled" because he was not aware that anybody was going to be living in the house prior to the sale of the property but rather believed "it was going to be a shut and cold, you know, buy and sell" arrangement. Tr. Vol. III, p. 505. Garden ended the conversation and would not engage in future conversations with Pope.

[18] Pope eventually regained possession of the Finley property after going "through the court" system. Tr. Vol. III, p. 506. Upon regaining possession, Pope observed that the Finley property "was destroyed." Tr. Vol. III, p. 506. Pope ultimately repaired and sold the Finley property.

[19] Around the time that Pope approached Garden about selling the Finley property, Gary Jones and his wife April Brooks spoke to Garden about entering into a rent- or lease-to-own agreement. Garden suggested that Jones and Brooks "check out" the Finley property, after which Jones and Brooks signed a

Lease with Option to Purchase. Tr. Vol. III, p. 515. Pope neither (1) saw or signed the Lease with Option to Purchase that Jones and Brooks signed in relation to the Finley property nor (2) gave Garden permission to have anyone sign the documents in relation to the Finley property.

[20] After signing the lease document, Jones and Brooks paid a $1200.00 down payment to Garden. They lived at the Finley property for about a year. However, Jones and Brooks vacated the property when a law enforcement officer "showed up at the house with paperwork stating that [Pope] owned it." Tr. Vol. III, p. 520.

[21] The State subsequently alleged that Garden "on or about July 11, 2012, did, with intent to defraud, make a written instrument, that is: a document entitled Quitclaim Deed … in such a manner that said instrument purported to have been made by the authority of Anthony Pope, who did not give authority[.]" Appellant's App. Vol. II, pp. 110. The State also alleged that Garden "on or about September 29, 2012, did, with intent to defraud, utter to April Brooks and/or Gary Jones a written instrument, that is: a document entitled Lease with Option to Purchase … in such a manner that said instrument purported to have been made by the authority of Anthony Pope, who did not give authority[.]" Appellant's App. Vol. II, p. 111. Following trial, the jury found that the evidence was sufficient to prove the allegations set forth above.

[22] Review of the record reveals that Garden obtained Pope's signature on the quitclaim deed through fraud. Garden obtained Pope's signature on the deed

under the pretense that he was going to sell the Finley property for Pope—which was the only authority that Pope understood himself to be granting to Garden by signing the document. Pope neither understood that he was signing a document which would transfer his ownership of the property nor did he intend to do so.

[23] By deceiving Pope in this way, Garden made the Quitclaim Deed appear to be something which it was not. Again, the Indiana Supreme Court has held that forgery "includes every act which fraudulently makes an instrument appear what it is not." *Jordan*, 502 N.E.2d at 913. Thus, because Garden used fraudulent means to obtain Pope's signature on the Quitclaim Deed, Garden's conduct falls within the purview of the forgery statute. The evidence, therefore, is sufficient to sustain Garden's conviction under Count Fifteen.

[24] Review of the record also reveals that Garden fraudulently executed a document entitled Lease with Option to Purchase for the Finley property with Jones and Brooks. This document stated that Jones and Brooks shall have an option to purchase the Finley property from Garden at any time during the term of the lease. Pope, the true owner of the property, was neither aware of nor consented to this lease. Likewise, Pope had not knowingly given Garden the authority to lease the Finley property. Jones and Brooks were forced to vacate the Finley property after Pope became aware of the lease agreement and asserted his legal right to the property.

Garden led Jones and Brooks to believe that they had both a valid lease and a valid option to purchase the Finley property. By deceiving Jones and Brooks in this way, Garden made the lease agreement appear to be something it was not. Again, forgery "includes every act which fraudulently makes an instrument appear what it is not." *Id*. Thus, because Garden used fraudulent means to convince Jones and Brooks to enter into the lease agreement, Garden's conduct falls within the purview of the forgery statute. The evidence, therefore, is sufficient to sustain Garden's conviction under Count Sixteen.

## C. Facts and Analysis Relating to Counts Six and Eighteen

Donald and Bertha Shackelford owned a home located at 5343 South Linwood Avenue in Indianapolis (the "Linwood property"). Donald retained the Linwood property after he and Bertha divorced. Donald subsequently filed bankruptcy after which he approached Garden about selling the home in the hopes of preventing the Linwood property from being sold at a sheriff's sale. Donald specifically told Garden that he did not want the Linwood property rented, but rather wanted it sold.

Garden gave Donald a number of documents to sign but did not explain what any of the documents were. Donald ultimately signed the following documents at Garden's direction: (1) a Quitclaim Deed indicating that the Linwood property was being sold to Garden for $1000.00 in consideration, (2) a Limited Power of Attorney, and (3) a Listing Contract granting Garden the exclusive right to sell the Finley property. Garden did not explain to Donald what either the Quitclaim Deed or the Limited Power of Attorney forms were. Donald was

told only that the Limited Power Attorney form "was just needed to help." Tr. Vol. I, p. 190. Donald also understood that the Listing Contract enabled Garden to assist Donald in selling the Linwood property. Garden led Donald to believe that the forms were needed "[t]o expedite a deal with an investment group" and to "sell the house." Tr. Vol. I, p. 189.

[28] Following the execution of these documents, Donald learned that someone was living at the Linwood property. Donald learned that the individual was "buying it on contract" from Garden. Tr. Vol. I, p. 193. Donald did not know about this arrangement, had not given Garden permission to "put anybody in [his] house[,]" and had not signed any documentation relating to the alleged purchase agreement. Tr. Vol. I, p. 194. Donald's attempts to communicate with Garden about the alleged purchase agreement were unsuccessful as Garden would not answer Donald's phone calls or respond to Donald's emails. Eventually, this purchase agreement fell through and the original tenants moved out of the Linwood property.

[29] Some time later, after Jones and Brooks were told by law enforcement officers that they had to vacate the Finley property, Garden told Jones and Brooks that he would get them into another home. Garden showed Jones and Brooks the Linwood property after which the couple signed a document entitled "Agreement to Sell Real Estate." State's Ex. 8. This document was dated July 7, 2013, and listed the seller of the property as Garden's company, Five Star Homes.

Garden assured Jones and Brooks that he was the owner of and had the deed to the Linwood property. Jones and Brooks relied on Garden's assurances. However, despite living at the Linwood property for nearly a year, the purchase agreement fell through and Jones and Brooks were ultimately forced to move out of the Linwood property after learning that Garden did not own the property. All told, Jones and Brooks paid Garden approximately $10,000.00 over the course of the time that they lived in the Finley and Linwood properties.

The State subsequently alleged that Garden "on or about October 14, 2010, did, with intent to defraud, make a written instrument, that is: a document entitled Quitclaim Deed … in such a manner that said instrument purported to have been made by the authority of Donald Shackelford, who did not give authority[.]" Appellant's App. Vol. II, p. 106. The State also alleged that Garden "on or about July 7, 2013, did, with intent to defraud, utter to April Brooks and/or Gary Jones a written instrument, that is: a document entitled Agreement to Sell Real Estate with the property identified as 5343 South Linwood … in such a manner that said instrument purported to have been made by the authority of Donald Shackelford, who did not give authority[.]" Appellant's App. Vol. II, p. 112. Following trial, the jury found that the evidence was sufficient to prove the allegations set forth above.

Review of the record reveals that Garden obtained Donald's signature on the quitclaim deed through fraud. Garden obtained Donald's signature on the deed under the pretense that he was going to sell the Linwood property for Donald—

which was the only authority that Donald understood himself to be granting to Garden by signing the document. Donald neither understood that he was signing a document which would transfer his ownership of the property nor did he intend to do so.

[33] By deceiving Donald in this way, Garden made the Quitclaim Deed appear to be something which it was not. Again, the Indiana Supreme Court has held that forgery "includes every act which fraudulently makes an instrument appear what it is not." *Jordan*, 502 N.E.2d at 913. Thus, because Garden used fraudulent means to obtain Donald's signature on the Quitclaim Deed, Garden's conduct falls within the purview of the forgery statute. The evidence, therefore, is sufficient to sustain Garden's conviction under Count Six.

[34] Review of the record also reveals that Garden fraudulently executed a document entitled Agreement to Sell Real Estate for the Linwood property with Jones and Brooks. This document stated that Garden, through his company Star Homes was the seller of the Linwood property. The document further stated that Garden held marketable title of the Linwood property, and Garden assured Jones and Brooks that he was the owner of and held the deed to the Linwood property. Donald, the true owner of the property, was neither aware of nor consented to this agreement. As was the case with the Finley property, Jones and Brooks were forced to vacate the Linwood property after they learned that Donald, and not Garden, was the rightful owner of the Linwood property.

Garden led Jones and Brooks to believe that they had a valid purchase agreement for the Linwood property. By deceiving Jones and Brooks in this way, Garden made the agreement appear to be something it was not. Again, forgery "includes every act which fraudulently makes an instrument appear what it is not." *Id*. Thus, because Garden used fraudulent means to convince Jones and Brooks to enter into the agreement, Garden's conduct falls within the purview of the forgery statute. The evidence, therefore, is sufficient to sustain Garden's conviction under Count Eighteen.

## D. Facts and Analysis Relating to Count Twenty-Four

In the Spring of 2014, Garden owned a home located at 2801 Lockburn Street in Indianapolis (the "Lockburn property"). Amy Jones, in her role as a supervising attorney for the Health and Hospital Corporation of Marion County ("HHCMC"), filed an "Emergency Cause of Action for issues of habitability inside" the Lockburn property. Tr. Vol. III, p. 686. On April 10, 2014, Garden entered into an agreed entry with HHCMC in which the parties agreed that the Lockburn property would "be vacant and remain vacant until such a time as all utilities are restored by approved means and verified by [an Environmental Health Specialist]." State's Ex. 91. Pursuant to the agreed entry, the Lockburn property was to remain vacant at least until a hearing on May 15, 2014.

Also in the spring of 2014, Dustin Barnes and his girlfriend, Star McKinney, were looking for a residence to rent in Indianapolis. Barnes and McKinney came into contact with Garden after seeing "an ad in the newspaper he had for

a house for rent." Tr. Vol. III, p. 737. Garden offered to rent them the Lockburn property. Before deciding whether to rent the Lockburn property from Garden, Barnes went to look at the Lockburn property. When Barnes went to look at the Lockburn property, he observed persons living in the house. Barnes had been told that if he encountered anyone at the Lockburn property, he should say that he "was a maintenance guy and … was coming in to look at the house for maintenance." Tr. Vol. III, p. 726. The Lockburn property had several maintenance issues that needed to be addressed, but Barnes felt he was capable of making the necessary improvements given his background in construction.

[38]    Two weeks later, Barnes and McKinney entered into a lease agreement for the Lockburn property. Barnes and McKinney paid Garden a $800.00 down payment. Garden, however, did not inform Barnes and McKinney of the agreed entry with HHCMC.

[39]    When Barnes and McKinney went to look at the Lockburn property prior to moving in, they observed that numerous items were missing from the house. They also observed toilets, tubs, sinks, and buckets, all full of feces. Given the state of the Lockburn property, Barnes and McKinney ultimately decided not to move in to the home because it was not suitable for their asthmatic children to live in. Barnes requested that Garden return his $800.00 deposit, but Garden refused. Garden threatened to called the police on Barnes and "tried to order [Barnes] to move into the house." Tr. Vol. III, p. 732.

[40]    The State subsequently alleged that Garden "on or about April 27, 2014, did, with intent to defraud, utter to Star McKinney and/or Dustin Barnes a written instrument, that is: a document entitled Residential Lease Agreement … in such a manner that said instrument purported to have been made by the authority of the City of Indianapolis, Health and Hospital Division and/or the Marion Superior Court, Room 12, who did not give authority[.]" Appellant's App. Vol. II, p. 114. Following trial, the jury found that the evidence was sufficient to prove the allegations set forth above.

[41]    Review of the record reveals that Garden acted with an intent to deceive Barnes and McKinney when he fraudulently entered into a lease agreement for the Lockburn property. Garden knew that the Lockburn property was uninhabitable when he entered into the lease agreement as is evidenced by the fact that he had entered into an agreed entry with HHCMC which stated that the Lockburn property was uninhabitable and was to remain vacant at least until a hearing on May 15, 2014.

[42]    By deceiving Barnes and McKinney in this way, Garden made the agreement appear to be something it was not. As has been stated a number of times above, the Indiana Supreme Court has held that forgery "includes every act which fraudulently makes an instrument appear what it is not." *Jordan*, 502 N.E.2d at 913. Thus, because Garden used fraudulent means to convince Barnes and McKinney to enter into the agreement, Garden's conduct falls within the purview of the forgery statute. The evidence, therefore, is sufficient to sustain Garden's conviction under Count Twenty-four.

# Conclusion

[43]    In sum, we conclude that the evidence is sufficient to sustain the challenged convictions.  As such, we affirm the judgment of the trial court.

[44]    The judgment of the trial court is affirmed.

Najam, J., and Riley, J., concur.