ATTORNEY FOR APPELLANT
P. Jeffrey Schlesinger
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

Ryan D. Johanningsmeier
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

_____

No. 45S04-0611-CR-477

RONNIE DRANE,

*Appellant (Defendant Below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff Below).*

_____

Appeal from the Lake Superior Court, No. 45G03-0410-MR-12
The Honorable Thomas Webber, Judge *Pro Tempore*

_____

On Petition To Transfer from the Indiana Court of Appeals, No. 45A04-0503-CR-164

_____

**May 29, 2007**

**Shepard, Chief Justice.**

At the conclusion of a bench trial, the court found appellant Ronnie Drane guilty for the rape and murder of Tomorra "Precious" Taylor and sentenced him to a combined total of eighty-five years. The Court of Appeals reversed for insufficient evidence. Having granted transfer, we affirm the trial court.

**Facts and Procedural History**

Tomorra "Precious" Taylor and her cousin Adrian Ross spent the afternoon of May 27, 2002, together visiting friends and family in Gary, Indiana. They stopped at Steve Chatfield's home, and Taylor borrowed Chatfield's phone to call Ronnie Drane. (State's Ex. 3, 5; Tr. at 190-94.) Taylor later stopped at a gas station to make a telephone call, and shortly after she completed the call, a man driving a "silver van" with "nice rims" arrived. (Tr. at 107.) Taylor left Ross and climbed into the passenger seat of the van to talk to the male driver. (Id. at 108.) Taylor shortly returned to her car, and she and Ross continued visiting friends and family. (Id. at 111.)

At about 8 p.m., Taylor and Ross went to the home of Taylor's foster mother, Chinese Lofton. (Id. at 111-12.) Taylor placed several more telephone calls to Drane and made arrangements to meet him that night. (Id. at 435-37.) Taylor's last conversation with Drane was at 9:47 p.m.; shortly thereafter, Taylor left Lofton's home alone. (Id. at 39, 44-46; State's Ex. 5.)

Between 11:00 and 11:30 p.m., off-duty Gary Police Corporal John Jones noticed a "gray or silver mini-van" parked in M.C. Bennett Park near the barbecue shelters. (Tr. at 289-95, 301.) The van stood out because the park closed after sunset, and park police were supposed to make sure the park was empty. (Id. at 289.) Corporal Jones testified that the van had "elongated taillights," or in other words, lights "[o]n the rear driver and passenger side [that] start pretty much at the top and go down to almost the bumper."[1] (Id. at 291.) Two to three hours later, on his way home, Corporal Jones saw what appeared to be the same van parked in the same spot. (Id. at 290.)

At about 9 a.m. the next morning, a man collecting cans in the park found Taylor's body in a shelter close to the location where Corporal Jones saw the van the previous night. (Id. at 21, 75-77, 291-93.) Taylor's body was face down, and her legs were spread open. (Id. at 22, 355-56; State's Ex. 6, 7.) Her blue jean skirt was pulled up so that her genitalia were visible. (Tr. at 22, 355-56; State's Ex. 6, 7.) Her shoes were strewn about a nearby picnic table. (Tr. at 22, 355-

---

[1] Corporal Jones compared the taillights to those usually seen on a "Chevy Lumina or something." (Tr. at 291.)

56; State's Ex. 6, 7, 53.) Taylor had several injuries, including a bruised and lacerated lower lip, abrasions on her ear, left jaw, and upper back, a fractured bone in her neck, and a large bruise on her upper right thigh. (Tr. at 143-48, 171-73.) The coroner concluded strangulation was the cause of death. (Id. at 139.)

Detectives found Drane after they traced phone calls Taylor made and received on the night she was killed. (Id. at 190-94.) Those calls first led them to Tiffany Copeland's home. (Id.) Detectives soon learned Drane lived with Copeland and used a cellular phone registered in Copeland's name. (Id. at 360, 365, 435.) Copeland's home was about one mile from the park where Taylor's body was discovered. (Id. at 369.) While detectives were speaking with Copeland, they noticed a silver van at the house next door, seemingly a match with the descriptions given by Corporal Jones and Ross. (Id. at 195, 199-200, 231-32.) The van was registered in Copeland's name, but driven by Drane. (Id. at 369, 448.)

When Corporal Jones was shown pictures of Copeland's van at trial, he testified that the van in the pictures was likely the same van he saw in the park on the night of Taylor's murder.[2] Similarly, when Ross viewed pictures of Copeland's van at trial, she testified that the van looked like the same van that she and Taylor encountered at the gas station on the afternoon preceding Taylor's murder.[3]

---

[2] Corporal Jones testified:

> Q. And, what significance do those photographs have to yourself?
> A. To the best of my knowledge and ability, it's the vehicle I seen parked at the M.C. Bennett parking lot that evening.
> Q. Would it be fair to say that it looked similar to that vehicle?
> A. Yes, very similar, same make, model, color.
> Q. As to the bumper taillights, is that the same type of bumper taillights that you saw on the vehicle?
> A. Yes.

(Tr. at 294.)

[3] Ross testified:

> Q. I'm handing you what's been marked as State's Exhibit 9, 10, and 42. Does the van in those photos look like the van from the gas station?
> A. Yes, it do.
> Q. Can you explain why it looks like the van from the gas station, what you remember?
> A. The rims.
> Q. The rims?
> A. Yes.
> Q. Okay, anything else?

3

Tests of DNA samples found on vaginal cervical swabs and external genital swabs obtained from Taylor's body revealed that Drane could not be excluded as a contributing source. (Id. at 317, 326.) In fact, Drane admitted during his case-in-chief that he had unprotected sexual intercourse with Taylor on the night of her murder. (Id. at 440-41.) He claimed, however, that he and Taylor had consensual sex at his home, that she left shortly after midnight, and that he never saw her again. (Id. at 440-44.)

The State charged Drane with murder, murder in the perpetration of rape, and rape. The trial court found him guilty on all counts, merged the first two counts, and sentenced Drane to sixty-five years for murder and twenty years for rape, to be served consecutively. The Court of Appeals reversed, concluding the State did not present sufficient evidence to support the murder and rape convictions. Drane v. State, No. 45A04-0503-CR-164, slip op. (Ind. Ct. App. Jun. 29, 2006). We granted transfer and now affirm the trial court.

**Sufficiency of the Evidence**

To make a long story short, we think the Court of Appeals reweighed the evidence.

When reviewing the sufficiency of the evidence to support a conviction, "appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict." McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005) (emphasis added). It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. Wright v. State, 828 N.E.2d 904 (Ind. 2005). To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it "most favorably to the trial court's ruling." Id. Appellate courts affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a

---

A. The lights in the back, the color.
Q. What lights in the back?
A. The lights that go up to the ceiling, the break lights.

(Tr. at 231.)

4

reasonable doubt." Jenkins v. State, 726 N.E.2d 268, 270 (Ind. 2000) (emphasis added).[4] It is therefore not necessary that the evidence "overcome every reasonable hypothesis of innocence." Moore v. State, 652 N.E.2d 53, 55 (Ind. 1995). "[T]he evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." Pickens v. State, 751 N.E.2d 331, 334 (Ind. Ct. App. 2001).[5]

Accounting for the trial court's role as finder of fact to decide what evidence to credit, the task for us, as an appellate tribunal, is to decide whether the facts favorable to the verdict represent substantial evidence probative of the elements of the offenses. We conclude that they are and elaborate here on some of the facts described above.

By his own admission, Drane talked to Taylor multiple times on the night of her murder. (Tr. at 435-36.) He made arrangements to see Taylor. (Id.) Drane not only saw Taylor, but he admitted having sexual intercourse with her the same night she was murdered. (Id. at 440.) His own testimony, combined with DNA evidence and phone records support these facts.

Although Drane denied being present at the park where Taylor's body was later discovered, the State presented eyewitness evidence to the contrary. On the night of Taylor's murder, Corporal Jones observed a "gray or silver mini-van" with "elongated taillights" parked near the shelter where Taylor's body was found. (Tr. at 289-95, 301.) Corporal Jones was familiar with the area because he lived nearby, and the lone van in the parking lot of a closed park caught his attention. (Id. at 289.) When shown pictures of the van found next door to Drane's home, the van Drane admitted driving the day he first met Taylor, Corporal Jones testified that he believed the van was the same "make, model, [and] color" as the van he saw in the park on the night of Taylor's murder. (Id. at 294, 448.) Further, Corporal Jones concluded, "[t]o the best of [his] knowledge and ability," the van in the State's exhibits was the same van he

---

[4] Expressed another way, "appellate courts must affirm 'if the probative evidence and reasonable inferences drawn from that evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt.'" McHenry, 820 N.E.2d at 126 (quoting Tobar v. State, 740 N.E.2d 109, 112 (Ind. 2000)) (emphasis added).
[5] Drane contends the trial court erred by taking under advisement his motion for a directed verdict at the close of the State's case. Largely for the reason that the State's evidence recited above constituted a prima facie case, we reject this contention.

saw parked in the same spot twice on the night of Taylor's demise (once between 11:00 and 11:30 p.m. and again on his way home two to three hours later). (Id. at 290-94.)

Ross also linked Drane to a van matching the description of the van Corporal Jones saw in the park. Phone records confirm Taylor used Chatfield's phone to call Drane on the afternoon Taylor and Ross visited friends in Gary. (State's Ex. 3, 5; Tr. at 190-94.) Later that afternoon, Taylor and Ross stopped at a gas station where Taylor used a pay phone to make another call. (Tr. at 107.) Ross testified that shortly after Taylor made this call, a "silver van" with "nice rims" pulled up to meet Taylor. (Id.) When shown the same pictures of the van Drane admittedly drove, the same pictures shown to Corporal Jones, Ross testified that it looked like the van from the gas station, recognizing "[t]he rims," "[t]he lights in the back, [and] the color."[6] (Id. at 231-32.) While the Court of Appeals expressed concern that the Gary Police never searched the van to compare its tires with those found at the park, Drane, slip op. at 11-12, the weight due this omission is a matter of speculation. One thing we do know, aside from the fact that Drane drove the van earlier in the day, is that Drane's meeting with Taylor began late on May 27 and continued into May 28. (Tr. at 439-41.)

Drane's own testimony and the DNA evidence conclusively prove he had sexual intercourse with Taylor on the night of her murder. Testimony from Corporal Jones and Ross permits the reasonable inference that the van Drane drove was parked near the crime scene on the night of Taylor's murder. Photographs of Taylor's body and review of the coroner's report permit the reasonable inference that Taylor was raped in the course of her brutal murder. If Taylor were in fact raped by someone other than Drane, there was no evidence, scientific or otherwise, to suggest it. There is more than sufficient evidence to support both the murder and rape convictions.

---

[6] Drane testified that the van he drove was in the body shop on the day of Taylor's murder. Although conflicting testimony was presented, the trial court believed Ross and concluded the van at the gas station was the van driven by Drane. As a result, the trial court questioned the veracity of the remainder of Drane's testimony. (Tr. at 522-23.)

## Conclusion

We affirm the trial court.

Dickson, Sullivan, Boehm, and Rucker, JJ., concur.