Pursuant to Ind.Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before
any court except for the purpose of
establishing the defense of res judicata,
collateral estoppel, or the law of the case.

ATTORNEY FOR APPELLANT:

**JILL M. ACKLIN**
Westfield, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

Mar 13 2012, 9:27 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

ELWIN HART,                        )
                                   )
    Appellant-Defendant,           )
                                   )
        vs.                 )    No. 49A02-1107-CR-583
                                   )
STATE OF INDIANA,                  )
                                   )
    Appellee-Plaintiff.            )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Kurt M. Eisgruber, Judge
Cause No. 49G01-1002-MR-13454

**March 13, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Elwin Hart appeals his convictions for murdering his girlfriend and her future daughter-in-law. He argues that the evidence is insufficient to prove that he was the perpetrator. Concluding that the evidence shows that Hart indeed committed these senseless crimes, we affirm.

**Facts and Procedural History**

In February 2010, Chad Nickle, his girlfriend Elizabeth Newcomer, his mother Linda Nickle, and Linda's boyfriend Hart all lived together in a house on the southwest-side of Indianapolis. Chad and Elizabeth, who were engaged to be married, had recently moved in with Linda and Hart to help them pay bills. In addition, Linda and Hart had recently purchased a white Chevy Silverado truck that Hart drove.

Chad worked out of state for eleven months of the year doing environmental demolition and was in Milwaukee, Wisconsin, on February 20, 2010. On that morning, Elizabeth called Chad and told him that she had found a baggie of white powder that she suspected to be cocaine. Chad instructed Elizabeth and Linda to go to a nearby bike shop, Thugs Incorporated Choppers, so that his friend Dennis Gibson could test the white powder. Dennis, who had experimented with cocaine before, tasted the powder and concluded that it was cocaine. Based on this information, Chad told Elizabeth to tell his mother that Hart had to move out. Chad directed the women to call him right after they told Hart the news. Dennis also told the women that if they needed help evicting Hart, they should call him.

Around 2:00 p.m., Chad still had not heard from his fiancée or mother. Because Chad was concerned that he could not reach them by phone, he had Dennis and another bike shop employee go to the house. They knocked on the door, but no one answered. They spotted Elizabeth's red truck in the driveway but not Hart's white truck. Dennis called Chad to report their findings.

Around 4:00 p.m., Chad received a concerned call from Elizabeth's mother because Elizabeth did not show up at a family event. Chad then contacted a childhood friend, Daniel Sprouse, and asked him to go to the house. At the time, Daniel and his wife were in Noblesville at a swim meet. When Daniel arrived at the house, he observed Elizabeth's red truck in the driveway and Linda's car in the garage. Hart's white truck was not there. Chad instructed Daniel to ring the doorbell, pound on his mother's bedroom window, and beat on the garage door. Chad and Daniel stayed on the phone the entire time. When there was no response, a frantic Chad instructed Daniel to break in. Daniel broke a window on a door that led to the garage and entered the house. Upon entering the living room, Daniel started screaming to Chad over the phone that Elizabeth and Linda were dead. Both had been shot in the head and were sitting upright with the television still on. A dropped coffee cup was at Linda's feet. Elizabeth was shot three times, and Linda was shot once. Daniel rushed out of the house and told his wife to call 911. While Daniel and his wife were standing in the middle of the street waiting for emergency responders, they noticed a white Chevy truck that they believed to be Hart's parked on the wrong side of the street about 200 feet away. Daniel and his wife called

3

911 again. Fearing for their safety, Daniel and his wife took shelter in their car. The white truck backed up and disappeared.

Emergency responders arrived at 5:08 p.m. and confirmed that Elizabeth and Linda were dead. Their identifications and cell phones were missing, but there were no other signs of a robbery, as nothing was missing and the house was in a neat and orderly condition. Police recovered a baggie of white powder from the kitchen, but it was later determined not to be cocaine.

In the meantime, Hart called his boss, Victor Fleming, and left two voicemails saying that he would not be at work on Monday. According to Victor, the first voicemail stated:

> Victor, it's me, Elwin Hart. I'm calling you to thank you for the opportunity to work with Laker Medical. You are great people and I enjoy to work [sic] with you. I hope everything will be better, but I won't be able to come back to work on Monday because something is not – something went wrong.

Tr. p. 307, 314. According to Victor, the second voicemail stated:

> Thank you for the opportunity. Thank you for you guys. You guys are good people and I appreciate the opportunity to work with your company, but I won't be able to go back to work on Monday since I did something very wrong and I'm about to turn myself in to the police.

*Id.* at 311, 314.[1]

Hart then went to Lynhurst Baptist Church, where he had been attending services for several years. He called 911 from the church at 5:17 p.m. and told the dispatcher that he was calling to report a double homicide that had occurred at his residence and he would meet the police at the front door of the church. While inside the church, Hart

---

[1] Victor said that both voicemails had been recorded by a detective; however, by the time of trial, that detective had died and neither the voicemails nor a transcript of the voicemails could be found.

4

encountered longtime church member Shirley Clements who was there for her granddaughter's wedding. The wedding was over, and the wedding party and family had finished taking pictures and were getting ready to go to the reception. Hart asked Shirley if he could see the pastor. Shirley said that the pastor had just left. Hart responded that he wanted to see the pastor "but that he couldn't wait any longer" because "the police were on their way out there to arrest him." *Id.* at 203. When Shirley asked him "[w]hat in the world . . . the police [were] going to arrest [him] for," Hart responded that he had "shot Linda and her future daughter-in-law" around noon. *Id.* Hart added that "he wasn't going to let them frame him the way they were trying to do." *Id.* When Hart explained that he had come to church to pray with the pastor, Shirley said she would pray with him instead. Shirley then summoned her nearby husband, and the three of them prayed on the spot. After the prayer, Hart and Shirley hugged, and Hart said that he was going to wait for the police outside. Because Shirley had to get to the wedding reception, she had a church elder, Bruce Litton, wait with Hart. While they were waiting, Hart told Bruce that Linda had found some white powder in the kitchen and claimed it was his. Linda then had the white powder tested at a motorcycle shop to see if it was in fact cocaine. Hart was adamant during his conversation with Bruce that he did not use cocaine. Hart explained that he and Linda got into an argument over whether the substance was in fact cocaine, at which point Linda told him to move out. At this point, police pulled up and ordered Hart to show his hands. When the police asked where the weapon was, Hart responded that it was in his truck. A search of Hart's truck revealed a pistol, two magazines, and a box containing marijuana. The forensic testing from the pistol was

5

"inconclusive," meaning that the pistol could not be identified or eliminated as the murder weapon. *Id.* at 269. Nevertheless, the testing on the bullets recovered from the victims showed that all four bullets were fired from the same gun.

Days later, the State charged Hart with two counts of murder, Class A misdemeanor carrying a handgun without a license, and Class A misdemeanor possession of marijuana. A three-day jury trial was held in May 2011. The jury found him guilty as charged, and the trial court sentenced him to an aggregate term of 110 years.

Hart now appeals his convictions.

**Discussion and Decision**

Hart contends that the evidence is insufficient to support his murder convictions. Hart concedes that although "there is a suspicion of guilt that [he] committed the murders" and "he undoubtedly had the opportunity to commit the murders," the evidence is nevertheless insufficient because the forensic evidence "could not identify [his] gun as the murder weapon" and other people "could have been motivated to seek drugs from the house . . . ." Appellant's Br. p. 10.

When reviewing the sufficiency of the evidence, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is the fact finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient. *Id.* To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it "most favorably to the trial court's ruling." *Id.* Appellate courts affirm the conviction unless "no reasonable fact-finder could find

6

the elements of the crime proven beyond a reasonable doubt." *Id.* at 146-47 (quotation omitted). It is therefore not necessary that the evidence "overcome every reasonable hypothesis of innocence." *Id.* at 147 (quotation omitted). "[T]he evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." *Id.* (quotation omitted).

The evidence is sufficient to sustain Hart's murder convictions. On appeal, Hart offers a one-paragraph argument that the forensic evidence did not link Hart's gun to the murder weapon and "an unknown perpetrator" could have entered the home to obtain drugs. Appellant's Br. p. 11. But this ignores the substantial evidence of Hart's guilt, including his confession to fellow church member Shirley. That is, Hart told Shirley that the police were coming to get him because he shot Elizabeth and Linda around noon that day. Hart revealed his motive when he told Shirley that Elizabeth and Linda were trying to frame him for the cocaine. In fact, several witnesses testified that the women told Hart that very day that he had to move out because they found what they believed to be cocaine. Hart expressed his frustration to Bruce that he was not a cocaine user.

Hart was not quiet about what he had done, either. In addition to telling Shirley that he shot the women, Hart told his supervisor at work, a 911 dispatcher, and a church elder that he had done something wrong for which the police needed to get him. When Hart spoke with the 911 operator, he reported a "double homicide" at his house and asked for the police to come get him. State's Ex. 63.

In addition, Hart had access to the locked house where the victims were found. There was no forced entry other than where Daniel broke a window to enter. Notably,

7

Elizabeth and Linda were found sitting in the living room with the television on, as if they had not heard or encountered any danger. A spilled coffee cup was found on the floor by Linda. After Daniel discovered the women's dead bodies, he and his wife stood in the middle of the street waiting for emergency responders. They spotted a white truck about 200 feet away that looked like Hart's truck, but then it disappeared. Shortly thereafter, Hart himself called 911 and told the police to pick him up. When the police arrived at the church and asked Hart where the gun was, he directed them to his truck. Because the evidence is sufficient to prove that it was indeed Hart who killed Elizabeth and Linda, we affirm his murder convictions.

Affirmed.

ROBB, C.J., and NAJAM, J., concur.