# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 26 2018, 10:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine Cooper
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Marvin Williams,
*Appellant-Defendant*,

v.

State of Indiana,
*Appellee-Plaintiff*.

March 26, 2018

Court of Appeals Case No.
49A05-1711-CR-2592

Appeal from the Marion Superior Court

The Honorable Marc T. Rothenberg, Judge

Trial Court Cause No.
49G02-1707-F3-26459

**Brown, Judge.**

Marvin Williams appeals his conviction for carrying a handgun without a license as a class A misdemeanor. Williams raises one issue which we revise and restate as whether the evidence is sufficient to sustain his conviction. We affirm.

## Facts and Procedural History

On July 15, 2016, Abrege Cruite called 911 and, upon questioning by the operator, indicated that she was in a vehicle with a male and was unable to speak about the person. For seven minutes, Cruite spoke in code, pretending to speak with her mother rather than the operator. When the operator asked if the male had any weapons, Cruite responded "yeah." State's Exhibit 1 at 3:06-3:09. During the time she spoke with Cruite, the operator dispatched police to the location of the call and informed the officers to look for a "possibly armed male." Transcript Volume 2 at 28.

Officer Jordan Bull of the Indianapolis Metropolitan Police Department ("IMPD") responded to the location of the call and pulled into the entrance of an apartment parking lot near 32nd Street and Baltimore Avenue. As Officer Bull turned south onto Brouse Avenue, Cruite ran towards him, seemed frightened and panicked, and was crying with her voice trembling. Officer Bull heard her say "a male[] was over there" and "[h]e's by the truck," and she directed his attention to the truck in the parking lot. *Id.* at 25. Williams was halfway in the passenger-side cab portion of the truck such that his upper torso "was kind of leaning in the [truck] and his legs were still on the ground." *Id.* at 26. After Officer Bull positioned his vehicle towards and drove closer to the

truck, Williams exited or quit leaning in the truck, shut the door and the hood of the truck, and started walking westbound. Williams had a tool or what appeared to be a wrench in his hands. Officer Bull exited his vehicle and ordered Williams to stop and to drop the tool. After doing so, Williams began to walk towards Officer Bull. Officer Bull and another officer, Sergio Rodriguez De Leon, conducted a pat-down of Williams and secured him in handcuffs. Williams appeared nervous and looked around a lot. Based upon Officer Bull's training and experience, Williams's demeanor raised a red flag that he might be "looking for a way out, to run or possibly fight, or who knows." *Id.* at 30. The officers arrested Williams.

[4] On their way to the scene, Officers Ivan Ivanov and Jason Beacker encountered Cruite on North Keystone Avenue and she was panicked, walking fast, and crying. When they arrived at Williams's location, Officer Ivanov spoke to Williams and then to Detective Chris White, who had arrived at some point. Based on his conversation with Detective White, Officer Ivanov completed an inventory search of the truck, pursuant to IMPD General Order 7.3 governing the policy for towing and impounding vehicles.

[5] During the search, Officer Ivanov found tools and court paperwork belonging to Williams. The court paperwork was found in the truck's glovebox. Small items of clothing, speakers, and speaker wire were also found in the truck's cab compartment. Officer Beacker, who also conducted the inventory search, located a small black revolver behind the folding bench seat on the passenger side of the truck, lying "just like on the floor." *Id.* at 62. Officer Beacker, not

touching or moving the gun, notified Officer Ivanov, who then called for a gun liason, or an evidence technician, to process it. When Officer Thomas White arrived at the scene, the truck's back rest was leaning forward and he was directed to the gun laying on the floor of the vehicle, between the back rest and the back end of the cab. After he attempted to fingerprint the gun, Officer White collected and made the fully-loaded gun safe by opening the cylinder and removing five live rounds.

[6] On July 18, 2017, the State charged Williams with kidnapping as a level 3 felony; criminal confinement as a level 3 felony; pointing a firearm as a level 6 felony; domestic battery as a class A misdemeanor; battery resulting in bodily injury as a class A misdemeanor; and carrying a handgun without a license as a class A misdemeanor. On September 20, 2017, the court dismissed the first five counts.

[7] On October 11, 2017, Williams filed a motion to suppress all evidence directly or derivatively gained as a result of an illegal search and seizure of Williams and that stated, subsequent to Williams's arrest, "law enforcement searched [Williams's] person and the truck nearby him." Appellant's Appendix Volume 2 at 91-92. On October 13, 2017, the court denied the motion to suppress.

[8] The trial court held a bench trial on the remaining charge of carrying a handgun without a license at which the prosecutor introduced the recording of the 911 call as Exhibit 1 and counsel for Williams stipulated to its admission for purposes of the foundation of the suppression motion. After some discussion,

the court stated, "I have to listen to it anyway for the purposes of getting to the matter at hand," and "I mean I can disregard it if need be later." Transcript Volume 2 at 20. The recording reveals that Cruite described in code her location and clothing, ran, and then exclaimed "hurry up, hurry up please," "hurry the f--- up," and "he's trying to kill me." State's Exhibit 1 at 7:08-7:14. Later, after hearing the recording, the testimony of the first witness, and arguments by Williams's counsel and the prosecutor as to the suppression, the court stated:

> I do believe the 911 call does provide some very important information. At first I wasn't sure and will eventually get to whether or not it should be admitted I suppose for the purpose of trial. At first I wasn't sure it was an excited utterance but at the very end it clearly, in my opinion, is an excited utterance. But the information on the 911 call indicates someone fixing their car. Also indicates the location. Also indicates a woman who is fleeing from the situation and the person. When the police arrive they do in fact see a woman fleeing and they see that she is pointing to a truck, and in this truck, there is a man who eventually proves out to be the defendant, and therefore, I do think there is reasonable suspicion for the stop. So, at this time I will deny the motion to suppress.

Transcript Volume 2 at 43.[1]

---

[1] On appeal, Williams cites to State's Exhibit 1 in the Statement of Facts section of his appellant's brief and the Argument section of his reply brief. Appellant's Brief at 5-6; Appellant's Reply Brief at 6-8.

[9] Officer Bull testified that, based on what he observed, Williams appeared to be working on the truck and that he was holding a wrench in his hand. Officer Ivanov testified that, pursuant to IMPD General Order 7.3, he inventoried the truck for any valuables to prepare it for towing and that the windows and doors could not be locked. Officer Beacker testified, when asked to describe the seat, that "there's a pull knob thing th[at] comes up, you drop the seat down" and also testified that, if he remembered correctly, "there was a gap" before he moved the seat and that he believes that if he had looked behind the seat he would have seen the gun without moving it. *Id.* at 63. Officer White testified that when he was directed to the gun, it was positioned such that the grip was towards the driver's side and "up" and the "muzzle [was] pointing down towards the floor," that the gun "wasn't laying on the bottom of the floor" and leaned up against the back of the cab, and that it was about a "foot in or so" from the door and "[m]aybe about two or three feet" from the driver side of the seat. *Id.* at 69. He also testified that if he were to sit in the driver seat, the gun would be within his arm range and that when he first arrived, he could see it pretty plainly "from out of the vehicle." *Id.* at 70. When the prosecutor asked if there was "anything else back behind there other than the gun," Officer White stated "[j]ust like tool kit and stuff like that" and, when the prosecutor asked "[t]ools were back there," he followed up by responding, "[y]es ma'am. Like tire change. Tire – tire rod." *Id.* The gun was admitted into evidence over Williams's objection. At the conclusion of the trial, the court stated that "[i]n considering all the factors, I find that his [sic] did have the intent to maintain dominion and the capability of maintaining dominion or control over the

weapon" and that Williams "was in possession of a firearm without a license class A misdemeanor." *Id.* at 84. The court found Williams guilty as charged and sentenced him to 180 days in the Marion County Jail.

### *Discussion*

[10] The issue is whether the evidence is sufficient to sustain Williams's conviction for carrying a handgun without a license as a class A misdemeanor. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007), *reh'g denied*. We consider conflicting evidence most favorably to the trial court's ruling. *Id.* We affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)). The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.* at 147.

[11] Williams argues that there is no reasonable inference that he had actual knowledge of the presence of the gun in the truck as required and that the State failed to meet its burden of proving that he intended to convey or transport the gun in the truck. He contends that the State's evidence showed only momentary close proximity of the gun to Williams as he leaned into the truck briefly, that the gun was in plain view only after Williams was leaning into the car, and that the gun was not commingled with other items belonging to him.

[12] The State argues that sufficient evidence supports Williams's conviction and that he had control of the truck with knowledge of the gun's presence as well as the intent to transport or convey the weapon. Specifically, the State asserts that, with respect to Williams's control of the truck, he held a tool and was working on the truck when the officers arrived and that the officers located court paperwork in Williams's name. With respect to Williams's knowledge of the gun's presence, the State asserts that the officers testified that they observed the loaded gun on the floor of the passenger side of the vehicle where Williams was standing when the officers arrived on the scene, that the gun had been propped against the back of the cab, and that they found it about a foot in from the passenger side of the truck where they first observed Williams.

[13] In its July 18, 2017 charging information, the State cited Ind. Code §§ 35-47-2-1 and -1(e) and alleged that Williams did "knowingly carry a handgun in a vehicle or on or about his person, without being licensed as required by law." Appellant's Appendix Volume 2 at 17. At the time of the offense, Ind. Code § 35-47-2-1(a) provided in relevant part that a "person shall not carry a handgun in any vehicle or on or about the person's body without being licensed under this chapter to carry a handgun," and Ind. Code § 35-47-2-1(e) provided in part that a "person who knowingly or intentionally violates this section commits a Class A misdemeanor."[2]

---

[2] Subsequently amended by Pub. L. No. 221-2017, § 1 (eff. July 1. 2017).

[14] In reviewing a conviction under a previous version of the statute, the Indiana Supreme Court held that Ind. Code § 35-47-2-1 is "relatively broad" and "thus prohibits both carrying a handgun on or about one's person and carrying a handgun in a vehicle." *Henderson v. State*, 715 N.E.2d 833, 835, 835 n.2 (Ind. 1999).[3] When referring to the carrying of a gun on or about one's person, the statute proscribes "having on one's person an unlicensed handgun" and conviction of the offense does not require proof that the weapon was conveyed or transported from one place to another. *McAnalley v. State*, 514 N.E.2d 831, 834 (Ind. 1987).

[15] In *Henderson*, the Indiana Supreme Court addressed a conviction for carrying a handgun on or about the defendant's person, and held that "[t]he liberality of the Indiana text has nevertheless obliged us to examine the sort of evidence adequate to demonstrate that a defendant 'carried' the weapon." 715 N.E.2d at 835. The Court observed that it had "approached this task, and the similar question of 'possessing' drugs, by characterizing the possession of contraband as either actual or constructive." *Id.* Actual possession occurs when a person has direct physical control over the item. *Id.* Constructive possession occurs when a person has "the intent and capability to maintain dominion and control over the item." *Id.* When constructive possession is asserted, the defendant's

---

[3] In *Henderson*, the Indiana Supreme Court addressed a previous version of Ind. Code § 35-47-2-1, which provided: "a person shall not carry a handgun in any vehicle or on or about his person, except in his dwelling, on his property or fixed place of business, without a license issued under this chapter being in his possession." 715 N.E.2d at 835.

knowledge may be inferred from either the exclusive dominion and control over the premises containing the contraband or, if the control is non-exclusive, evidence of additional circumstances pointing to his knowledge of the presence of the contraband. *Id.* at 835-836. The intent element of constructive possession is shown if the State demonstrates the defendant's knowledge of the presence of the contraband. *Goliday v. State*, 708 N.E.2d 4, 6 (Ind. 1999). Proof of dominion and control has been found through a variety of means, including: (1) incriminating statements by the defendant, (2) attempted flight or furtive gestures, (3) proximity of the contraband to the defendant, (4) location of the contraband within the defendant's plain view, and (5) the mingling of the contraband with other items owned by the defendant. *Henderson*, 715 N.E.2d at 836.

[16] The record reveals that officers were dispatched in response to a 911 call and were looking for a "possibly armed male." Transcript Volume 2 at 28. During the 911 call, Cruite described in code her location and clothing, ran, and exclaimed "hurry up, hurry up please," "hurry the f--- up," and "he's trying to kill me." State's Exhibit 1 at 7:08-7:14. The operator asked Cruite if Williams had any weapons, and she responded "yeah." *Id.* at 3:06-3:09. When Officer Bull first encountered Williams, he was leaning halfway into the passenger-side cab portion of a truck, which had court paperwork belonging to him inside the glovebox, with his upper torso inside. The hood of the truck was up. When Officer Bull approached Williams, he quit leaning in the truck, shut its door and hood, and began walking westbound with a wrench away from the truck.

Williams appeared nervous, looked around a lot, and looked like he might be "looking for a way out, to run or possibly fight, or who knows." Transcript Volume 2 at 30. When the officers inventoried the truck, they found a gun in the back on the truck's passenger side. Officer Beacker, who located the gun, indicated that he believed he would have seen the gun without moving it if he had looked behind the seat. Officer White testified that the gun, which was located about a foot in or so from the passenger door and about two or three feet from the driver seat, would be within arm's range from the driver's seat, and that it could be seen from "out of the vehicle." *Id.* at 70.

[17] The court could reasonably infer from the evidence as set forth above and in the record that Williams had knowledge of the gun as well as the capability and intent to maintain control over it in light of his appearance, his proximity to it when officers first saw him, and other factors. Williams's argument is merely a request that we reweigh the evidence, which we will not do. *See Drane*, 867 N.E.2d at 146. We conclude that, under these circumstances, evidence of probative value exists from which the court could find that Williams had constructive possession of the gun and could have found him guilty beyond a reasonable doubt of carrying a handgun "on or about his person" without a license as a class A misdemeanor. *See Deshazier v. State*, 877 N.E.2d 200, 208 (Ind. Ct. App. 2007) ("Based on the totality of the circumstances, we conclude sufficient evidence exists to support Deshazier's conviction based on a theory that he constructively possessed the handgun while seated in the vehicle . . . ."), *trans. denied*.

## *Conclusion*

[18] For the foregoing reasons, we affirm Williams's conviction for carrying a handgun without a license as a class A misdemeanor.

[19] Affirmed.


Bailey, J., and Crone, J., concur.