

IN THE

# Court of Appeals of Indiana

Lauren Cupp,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Aug 08 2025, 8:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

August 8, 2025

Court of Appeals Case No.
24A-CR-2333

Appeal from the Boone Circuit Court

The Honorable Lori N. Schein, Judge

Trial Court Cause No.
06C01-2305-F6-1065

## Opinion by Judge Weissmann
Judge Scheele concurs.
Judge May dissents in part, concurs in result in part, and
concurs in full in part with a separate opinion.

**Weissmann, Judge.**

[1] When police attempted to serve an arrest warrant on Lauren Cupp, she drew a handgun, threatened an officer, and fled with her two young children through a residential neighborhood. Later in her flight, Cupp encountered a second officer. She yelled at the officer to stay back, fired a shot in his direction, and continued running until she was eventually apprehended. For this, Cupp was convicted of two counts of resisting law enforcement—one count for each officer she resisted—and two counts of felony neglect of a dependent. The trial court also imposed a sentence enhancement based on Cupp's use of a firearm during her resistance of the second officer.

[2] On appeal, Cupp challenges the sufficiency of the evidence supporting her conviction for resisting the second officer and claims the two convictions violate double jeopardy. She also disputes the imposition of the firearms enhancement. We affirm.

## Facts

[3] In May 2023, Officers John Pogorov and Reginald Thomas of the Whitestown Metropolitan Police Department drove to a residential subdivision to serve an arrest warrant on Cupp. Officer Pogorov located Cupp with her two children— a 4-year-old boy and a 13-year-old girl—near the subdivision's playground. Officer Pogorov, in full police uniform, approached Cupp and told her to "stop

right now." State's Exh. 7, 0:34-35. Instead of complying, Cupp briskly walked away from Officer Pogorov while asking if she was under arrest.

Officer Pogorov followed Cupp and told her she was being detained pursuant to an arrest warrant. Cupp denied having a warrant and kept walking away. As Officer Pogorov got closer, Cupp yelled, "It ain't your day, get the f*** back." *Id.* at 0:52-54. She then pulled a handgun from her purse and said, "Get away from me." *Id.* at 1:03. Upon seeing the gun, Officer Pogorov retreated to find cover. Meanwhile, Cupp and her children fled through a line of trees and houses.

By this time, Officer Thomas had positioned his marked police car on a nearby street to intercept Cupp's flight. Cupp soon emerged from between houses and entered the street. There, she encountered Officer Thomas, who exited his vehicle in full police uniform. Cupp yelled to Officer Thomas, "Play with me, I ain't playin'." State's Exh. 15, 0:02-04. She then fired her gun in Officer Thomas's direction and said, "Leave me and my kids alone. I didn't mean to fire it." *Id.* at 0:09-11. Cupp then took off running, leaving her children behind.

A K-9 unit eventually found Cupp hiding in a brush pile with a 9mm handgun within her arm's reach. The weapon contained one round in the chamber and three in the magazine, which is consistent with the gun having been fired once. Investigators collected home security footage of Cupp firing the gun and recovered from a driveway a shell casing matching Cupp's firearm.

[7] The State charged Cupp with four Level 6 felonies: (1) resisting law enforcement as to Officer Pogorov; (2) resisting law enforcement as to Officer Thomas; (3) neglect of a dependent as to Cupp's son; and (4) neglect of a dependent as to Cupp's daughter. The State also alleged that Cupp's sentence should be enhanced because she discharged a firearm at Officer Thomas while resisting him.

[8] A jury found Cupp guilty as charged on the four felony counts. After a bifurcated proceeding on the firearms enhancement, the jury was unable to reach a determination. The court declared a mistrial and the issue was retried in front of a new jury, who found that the enhancement applied. The trial court sentenced Cupp to six years for the four felonies plus five years for the enhancement, leading to an aggregate term of eleven years executed in the Indiana Department of Correction. Cupp appeals her convictions and sentencing enhancement.

## Discussion and Decision

[9] Cupp first challenges the sufficiency of the evidence supporting her conviction for resisting Officer Thomas. Alternatively, she claims that both convictions for resisting law enforcement cannot stand because they violate double jeopardy. Finally, Cupp argues that Officer Thomas, as a town police officer, does not fall within the firearms enhancement statute's scope. We affirm her convictions,

find no double jeopardy violation, and conclude that Officer Thomas was covered by the enhancement statute.

## I. Sufficiency of Evidence

[10] When reviewing challenges to the sufficiency of evidence, we consider only the probative evidence and reasonable inferences supporting the conviction. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We neither reweigh evidence nor reassess witness credibility. *Id.* We affirm unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Id.*

[11] To convict Cupp of Level 6 felony resisting law enforcement as to Officer Thomas, the State had to prove beyond a reasonable doubt that Cupp: (1) knowingly or intentionally; (2) fled from Officer Thomas; (3) after Officer Thomas, by visible or audible means, both identified himself as a police officer and ordered her to stop; and (4) used a deadly weapon while doing so. *See* Ind. Code § 35-44.1-3-1(c)(1)(B)(i) (2023). Cupp argues that Officer Thomas neither identified himself as a police officer nor ordered her to stop. But the evidence shows otherwise.

[12] The identification requirement of the resisting law enforcement statute is met by evidence showing that the defendant "ha[d] reason to know that the person [she] was dealing with is an officer." *Conley v. State*, 57 N.E.3d 836, 838 (Ind. Ct. App. 2016) (internal quotations omitted). This Court has held that "a police

officer wearing a full uniform and driving a marked police car is sufficient to meet this standard." *Id.* (citation omitted). Here, Officer Thomas drove a marked police car while wearing a full police uniform, including a tactical vest, badge, and various law enforcement equipment. Officer Thomas testified that the police markings on his vehicle would have been visible to Cupp as Officer Thomas opened his car door towards her. He also testified that he and Cupp looked in each other's direction before Cupp fired the weapon and took off running. This evidence sufficiently demonstrates that Cupp "ha[d] reason to know that" Officer Thomas was a law enforcement officer. *Id.*

[13] As for the order to stop, such orders may be communicated through visual indicators, not just verbal commands. *Id.* at 839 (finding raised hand gesture of uniformed officer sitting in marked police car to be a sufficient order to stop). Officer Thomas provided similar indicators by positioning his marked vehicle to intercept Cupp's flight and exiting the car in full uniform.

[14] This conduct, considering what had just happened, would lead a reasonable person to know that she had been ordered to stop by police. *See id.* at 838 (noting that determination of proper order to stop is "based on the circumstances surrounding the incident and whether a reasonable person would have known that he or she had been ordered to stop"). Cupp knew that Officer Pogorov had just attempted to execute a warrant for her arrest. *See Fowler v. State*, 878 N.E.2d 889, 895 (Ind. Ct. App. 2008) (noting defendant's knowledge

of officer's intent to execute warrant was relevant to defendant's understanding that he was ordered to stop). Cupp also knew that she had just fled from that officer after drawing her weapon. Her immediate hostile reaction to Officer Thomas—yelling threats and firing her weapon—demonstrates that she understood she again faced apprehension but chose to resist.

[15] Considering these circumstances, a reasonable jury could conclude that Officer Thomas visibly identified himself as a law enforcement officer and that Cupp understood she was being ordered to stop. Cupp's arguments—that Officer Thomas was roughly 200 feet away and that she may not have seen the vehicle's police markings—ask us to reweigh the evidence, which we will not do. *See Drane*, 867 N.E.2d at 146. The evidence most favorable to the verdict sufficiently supports Cupp's conviction for resisting Officer Thomas.

## II. Double Jeopardy

[16] Cupp next argues that her evasion from both officers was part of the "same act" and one "continuous crime." Appellant's Br., p. 19. She therefore contends that her two convictions for resisting law enforcement "should be vacated because double jeopardy bars two punishments for one set of circumstances." *Id.* at 19.

[17] We first note that Cupp fails to make clear the basis for her double jeopardy challenge. She never sets out the applicable legal standard under either the state or federal Constitutions, which both provide double jeopardy protections. She does not mention the Indiana Constitution or cite the framework used to

analyze substantive double jeopardy claims under *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020) and *Powell v. State*, 151 N.E.3d 256 (Ind. 2020). However, she once mentions the Fourteenth Amendment—which applies the Fifth Amendment's double jeopardy prohibition to the states—and cites *Lewis v. State*, 43 N.E.3d 689 (Ind. Ct. App. 2015), a federal double jeopardy case. We therefore understand her argument as a federal constitutional claim. *See id.* at 691 (finding similar claim of "one continuous incident" was "[e]ssentially" a double jeopardy argument based on federal constitution).

[18] "The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides: 'Nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb.'" *Rexroat v. State*, 966 N.E.2d 165, 168 (Ind. Ct. App. 2012) (quoting U.S. Const. amend. 5). The federal constitution thus "prohibits imposition of two punishments for a single offense arising from one set of operative circumstances." *Lewis*, 43 N.E.3d at 691.

[19] Federal double jeopardy claims are generally "evaluated under the 'same elements' test set out in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)." *Rexroat*, 966 N.E.2d at 168; *Wadle*, 151 N.E.3d at 248 n.24 (noting that *Blockburger*'s "statutory elements test" governs the analysis of substantive double jeopardy claims under the federal constitution). However, this test "contemplates whether a defendant can be convicted for conduct in a

single incident under two *separate* statutory provisions," and therefore it "does not apply" in cases like Cupp's which involve multiple violations of a *single* statute. *Rexroat*, 966 N.E.2d at 168 (emphasis added).

[20] Instead, where a single statute is violated multiple times, courts focus on whether the defendant committed separate acts, each of which independently violated the statute. *See Blockburger,* 284 U.S. at 302 (permitting multiple convictions under same statute where one prohibited transaction ended before the next occurred, meaning"[e]ach of several successive sales constitutes a distinct offense"). We look to the statute to determine how the offense is defined and the degree to which it is continuous in nature. *See Lewis*, 43 N.E.3d at 691 n.1 (citing *Blockburger*, 284 U.S. at 301-02 and *Hines v. State,* 30 N.E.3d 1216, 1220 (Ind. 2015)). "Whether a particular course of conduct involves one or more distinct 'offenses' under the statute depends on this congressional choice." *Sanabria v. United States*, 437 U.S. 54, 70 (1978).

[21] Turning to the resisting law enforcement statute, this Court has previously held that the offense is "a crime against public administration, not individual officers." *Armstead v. State*, 549 N.E.2d 400, 401 (Ind. Ct. App. 1990). As a result, "unless more than one incident occurs, there may only be one charge." *Id.* Thus, the critical inquiry is whether a defendant engaged in distinct incidents that each independently satisfy all elements of the statute. *See Bonner v. State*, 789 N.E.2d 491, 494 (Ind. Ct. App. 2003) (permitting multiple

convictions when each conviction "arises from a separate and discre[te] offense, such as when a subject resists the arrest efforts of different officers in distinct ways") (citing *Armstead*, 549 N.E.2d at 402). We find that Cupp engaged in two distinct incidents of resistance—with different officers, in different locations, and through different conduct—and therefore, her two convictions can stand.

[22] The first incident began and ended at the playground. When Officer Pogorov approached Cupp in full uniform and informed her that she was being detained pursuant to an arrest warrant, she denied the warrant and walked away. As Officer Pogorov pursued her, Cupp escalated by yelling "It ain't your day, get the f*** back," then drew a handgun from her purse and threatened, "Get away from me." State's Exh. 7, 0:52-54, 1:03. This display of deadly force achieved its intended effect: Officer Pogorov retreated to find cover, terminating the encounter. Cupp then successfully fled through the neighborhood with her children. At this point, Cupp had completed one crime of resisting—she had knowingly fled from an identified officer who ordered her to stop, and she used a deadly weapon in doing so. *See Sanders v. State*, 914 N.E.2d 792, 795 (Ind. Ct. App. 2009) (finding two incidents of resisting where one officer stopped pursuit for safety reasons and minutes later another officer began pursuit).

[23] The second incident occurred at a different location, after Cupp had traveled through trees and between houses. When Cupp emerged and encountered Officer Thomas exiting his police vehicle in full uniform, she did not merely

continue fleeing but initiated a new confrontation. She yelled threats at Officer Thomas: "Play with me, I ain't playin'." State's Exh. 15, 0:02-04. Then, in a significant escalation from her encounter with Officer Pogorov, she *fired* her weapon in Officer Thomas's direction before declaring, "Leave me and my kids alone. I didn't mean to fire it." *Id.* at 0:09-11. This was not a continuation of her flight but a separate decision to resist a different officer through more dangerous means.

[24] Based on this record, multiple factors establish two separate incidents rather than one continuous crime: (1) the temporal and tactical break caused by Officer Pogorov's retreat and termination of his pursuit; (2) the geographic separation of the two encounters; (3) the new and distinct decision Cupp made to resist through escalated conduct, rather than merely continue fleeing; and (4) the completeness of each violation, as both encounters independently satisfied all elements of the resisting statute.

[25] Though Cupp likens her case to *Lewis*, we find it distinguishable. In *Lewis*, the Court found only one conviction could stand where a defendant fled from an officer first by vehicle and then by foot. 43 N.E.3d at 692. But *Lewis* involved only a single officer in continuous pursuit of the defendant, who merely changed his mode of transportation mid-flight. There was no successful evasion and no escalation of force. By contrast, Cupp engaged in two separate encounters with two different officers: the first ended when she successfully

evaded Officer Pogorov after he retreated for cover, and the second began at a different location when Cupp confronted Officer Thomas with escalated violence. This distinction is critical under federal precedent like *Blockburger* and *Sanabria* because, unlike the uninterrupted flight in *Lewis*, each instance of Cupp's resistance constituted a discrete violation of the resisting statute with its own set of operative facts.

[26] Given the foregoing, we conclude that Cupp made separate, volitional choices to resist each officer in distinct encounters. Because Cupp's convictions were based on different incidents that each independently satisfied all elements of the resisting law enforcement statute, her double jeopardy argument fails under the federal standard.

## III. Firearms Enhancement

[27] Finally, Cupp challenges the enhancement of her sentence under subsection (h) of Indiana Code § 35-50-2-11 (Enhancement Statute). This Statute permits the imposition of an additional term of imprisonment for a person who, while committing a qualifying offense, knowingly or intentionally pointed or discharged a firearm at an individual that the person knew or should have known was a "police officer." Ind. Code § 35-50-2-11(h).

[28] Cupp argues that Officer Thomas, as an officer of the *town* of Whitestown, was not a "police officer" as defined in the Enhancement Statute. To make this argument, Cupp brings two related claims: (1) that the trial court erred in

denying her motion to dismiss the enhancement; and (2) that insufficient evidence supported the imposition of the enhancement. Because both claims turn on whether the Enhancement Statute applies to "town police officers," we address this question to resolve both claims. This requires us to interpret the Enhancement Statute—a question of law that we review de novo. *Suggs v. State*, 51 N.E.3d 1190, 1193 (Ind. 2016).

[29] When construing a statute, our primary objective is to determine and give effect to the legislature's intent. *Id.* We first give the words of the statute "their plain meaning and consider the structure of the statute as a whole." *ESPN, Inc., v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016). "To the extent there is an ambiguity, we determine and give effect to the intent of the legislature." *Id.* at 1196. We presume the legislature "intended for the statutory language to be applied in a logical manner consistent with the statute's underlying policy and goals." *Spells v. State*, 225 N.E.3d 767, 772 (Ind. 2024).

[30] The Enhancement Statute defines "police officer" to mean any of the following: (1) state police officer; (2) county sheriff; (3) county police officer; (4) city police officer; (5) state educational institution police officer; (6) school corporation police officer; (7) officer of a postsecondary school police department; (8) alcohol and tobacco commission officer; (9) conservation officer; (10) gaming

agent; and (11) inspector general investigator. Ind. Code § 35-50-2-11(c) (2022).[1] Absent from this definition is an explicit reference to "town police officer."

[31] Officer Thomas was undisputedly a town police officer, as he was employed by the town of Whitestown's police department. Cupp emphasizes this omission and contends that town officers do not fall within any of the listed categories, even the "city police officer" category, because towns are legally distinct from cities. The State counters that "town" and "city" are interchangeable terms for a municipality smaller than a county or state, meaning "town police officer" falls within the plain meaning of "city police officer."

[32] "City" is not defined in the Enhancement Statute, so we give the term its ordinary and usual meaning. *See State v. Hancock*, 65 N.E.3d 585, 587 (Ind. 2016). To do so, we may consult English language dictionaries. *Id.* Some dictionaries define "city" as a large town, suggesting that the term "city" encompasses "town."[2] Others describe "city" and "town" as distinct categories

---

[1] We note that months after the commission of the offenses and the State's filing of the notice to seek this sentence enhancement, this statute was amended. The amendment added hospital police officers to the list in subsection (c). We apply the statute in effect at the time of the offense.

[2] The Cambridge Dictionary defines city as "a large town." *City*, *Cambridge Dictionary*, https://dictionary.cambridge.org/dictionary/english/city (last visited June 24, 2025). Similarly, the American Heritage Dictionary defines "city" as a "center of population, commerce, and culture; a town of significant size and importance." *City*, *Am. Heritage Dictionary*, https://ahdictionary.com/word/search.html?q=city (last visited June 24, 2025).

in a municipal hierarchy.[3] Considering these varying definitions, we look to the "structure of the statute as a whole." *ESPN, Inc.*, 62 N.E.3d at 1195.

[33] The Enhancement Statute is wide in scope, including officers of both large agencies (state police) and small units (school officers). This demonstrates the legislature's intent to broadly protect officers who might face firearms in the course of their duties by imposing harsher penalties on defendants who jeopardize officer safety. Town officers fit comfortably within the statute's spectrum, and including them within the statute's protection gives effect to this legislative intent.

[34] Moreover, we "seek to give a practical application of the statute by construing it in a way that favors public convenience and avoids absurdity, hardship, or injustice." *Suggs*, 51 N.E.3d at 1194. We do not discern any legislative intent or practical reason for excluding town officers—who have the same core duties, training, state-wide jurisdiction, and exposure to firearms as their city counterparts[4]—while virtually every other category of law enforcement would be protected. Cupp's distinction would, in this context, arbitrarily deny protection to officers based solely on whether their employer is denominated a "town" or "city"—a difference that has no practical bearing on officer safety or

---

[3] Merriam-Webster's Online Dictionary defines "city" as "an inhabited place of greater size, population, or importance than a town or village." *City, Merriam-Webster's Online Dictionary*, https://www.merriam-webster.com/dictionary/city (last visited June 24, 2025).

[4] Officer Thomas testified that he had state-wide arrest powers, graduated from the Indiana Law Enforcement Academy, and regularly assisted other jurisdictions like the nearby city of Lebanon.

a defendant's conduct. Cupp's proposed interpretation thus undermines the clear purpose of the Enhancement Statute: to protect law enforcement officers who face firearms while performing their duties.

[35] We are unpersuaded by Cupp's remaining arguments. She relies on definitions of "city" and "town" from Title 36 of the Indiana Code, which concerns local government, not criminal law. Those definitions expressly apply only to Title 36, *see* Ind. Code § 36-1-2-1, and the Enhancement Statute specifically defines "police officer" for its own purposes, *see* Ind. Code § 35-50-2-11(c). And though Cupp claims that penal statutes must be strictly construed against the State, this principle applies "only when ambiguity remains after consulting traditional canons of statutory construction." *Falletti v. State*, 209 N.E.3d 456, 462 (Ind. Ct. App. 2023). Here, applying such canons resolves any ambiguity in favor of including town officers within the statute's protection.

[36] For these reasons, we conclude that the term "city police officer" in Indiana Code § 35-50-2-11(c) encompasses town police officers like Officer Thomas. Accordingly, we reject Cupp's claim that the trial court erred in denying her motion to dismiss the enhancement. We also reject her claim that insufficient evidence supported the imposition of the enhancement. The State undisputedly presented evidence that Officer Thomas was a police officer, and Cupp challenges no other aspect of the enhancement. We find Cupp has failed to show that the enhancement was improperly applied to her sentence.

## Conclusion

The evidence was sufficient to support Cupp's conviction for resisting Officer Thomas because a reasonable jury could conclude that he visibly identified himself as police, that Cupp understood she was ordered to stop, and that she fled anyways. Her double jeopardy claim fails because she committed two distinct acts of resistance. And finally, Officer Thomas qualifies as a "police officer" under the Enhancement Statute despite being employed by a town rather than a city. Accordingly, we affirm Cupp's convictions and sentence in all respects.

Scheele, J., concurs.
May, J., dissents in part, concurs in result in part, and concurs in full in part with a separate opinion.

ATTORNEY FOR APPELLANT

Riley L. Parr
Lebanon, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Daylon L. Welliver
Deputy Attorney General
Indianapolis, Indiana

**May, Judge, dissenting in part, concurring in result in part, and concurring in full in part.**

[38]  Resisting law enforcement is a crime against the State's authority, not against individual officers, and I therefore believe Cupp's evasion of two officers during a single flight should not result in her being convicted of two counts of resisting law enforcement by flight.  As a result, I respectfully dissent from my colleagues' decision to affirm both of Cupp's convictions of resisting law enforcement.

[39]  Indiana law has long held that the number of counts for which a person may be convicted of resisting law enforcement is not dependent on the number of officers involved:

> [A]s the *Armstead* court noted [in 1990], "a person who violates [the resisting law enforcement statute] harms the peace and dignity of the State of Indiana and its law enforcement authority." *Armstead*, 549 N.E.2d at 401.  We agree with the *Armstead* panel that resisting law enforcement is inherently an offense against authority, not the individual officers.  So, whether a defendant resists one officer or twenty-five officers, the offense remains the same.

*Paquette v. State*, 101 N.E.3d 234, 239-40 (Ind. 2018) (quoting and approving the reasoning of *Armstead v. State*, 549 N.E.2d 400 (Ind. Ct. App. 1990) (only one conviction of resisting permitted when defendant fought against three officers simultaneously)).  Therefore, "[i]n a single, continuous episode of resisting arrest by flight, only one offense is committed regardless of the number of

officers involved." *Vest v. State*, 930 N.E.2d 1221, 1223 (Ind. Ct. App. 2010) (rejecting Vest's argument that he was entitled to a unanimity instruction that required all jurors to agree that Vest had fled the same one of the three alleged officers, when two officers blocked the hallway to an exit door and another officer blocked exit through a window), *reh'g denied*, *trans. denied*.

[40] Herein, Officer Pogorov, his partner Officer Thomas, and Sergeant Scott Klinger – all of the Whitestown Metropolitan Police Department – were dispatched from their police station, where they had been eating lunch together, to the Royal Run neighborhood because a resident of the neighborhood had called police to report that Cupp – for whom there was an active arrest warrant – was near the neighborhood's clubhouse. Sergeant Klinger was going directly to Cupp's house, and he sent Officer Pogorov and Officer Thomas to the clubhouse in separate vehicles. When Officer Pogorov arrived, he saw Cupp walking away from the clubhouse with her children, so he parked his car and approached Cupp on foot to speak to her. As Officer Thomas pulled into the neighborhood, he saw where Officer Pogorov's car was parked, he saw Officer Pogorov "walking towards" Cupp and her children, and he saw Cupp "walking away on this path." (Tr. Vol. II at 121.) Therefore, instead of stopping where Officer Pogorov was, Officer Thomas drove to where he could intercept Cupp if she "continue[d] down the path[.]" (*Id.*) When Officer Thomas stepped out of his vehicle, he heard Officer Pogorov yell about Cupp having a gun, so he momentarily took cover behind trees. Officer Pogorov saw that Officer Thomas had stationed himself to intercept Cupp, so rather than follow Cupp on

foot, he ran back to his car to drive toward where Officer Thomas would intercept Cupp. Cupp, however, did not stay on the path toward Officer Thomas; she turned and disappeared behind houses, so Officer Thomas pulled his vehicle to where Cupp would exit from between the houses. When Cupp emerged, she discharged her firearm and began running. Although she hid in a pile of brush, she was found by police. Contrary to my colleagues, I see only one flight from law enforcement, as Officer Thomas and Officer Pogorov were working together to serve the arrest warrant on Cupp.

[41] Cupp had not evaded the police, only to be found at a distinct location at a distinct time. *Cf. Johnson v. State*, 774 N.E.2d 1012, 1015 (Ind. Ct. App. 2002) (five to ten minutes after evading an officer in one county who ended her chase due to fog, defendant encountered and fled a different officer in another county). Nor had she fled from the officers under Indiana Code section 35-44.1-3-1(a)(3) and then physically resisted arrest under Indiana Code section 35-44.1-3-1(a)(1). *Cf. Williams v. State*, 755 N.E.2d 1183, 1186 (Ind. Ct. App. 2001) (affirming two convictions – each based in a different statutory definition of resisting law enforcement – when Williams fled two officers on foot and then engaged in a fourteen-minute physical altercation with those officers when captured). Nor had Cupp's brandishing of a firearm resulted in "bodily injury, serious bodily injury, catastrophic injury, or death" to more than one person. Ind. Code § 35-44.1-3-1(h) (turning a single "offense" under subsection (c) into a "separate offense for each person" injured or killed by a defendant's act of resistance).

[42] Instead, Cupp's interactions with Officer Thomas and Officer Pogorov were moments apart within the same neighborhood; Cupp's resistance of both officers satisfied a single statutory definition of resisting – fleeing under Indiana Code section 35-44.1-3-1(a)(3); and Officer Thomas and Officer Pogorov were able to see one another as Officer Thomas waited for Cupp to come toward him as she fled Officer Pogorov. As such, I would hold that Cupp committed only one act of resisting law enforcement by flight. *See*, *e.g.*, *Miller v. State*, 726 N.E.2d 349, 352 (Ind. Ct. App. 2000) (reversing two of three counts of resisting law enforcement by flight when Miller fled – on foot, by car, and again on foot – from three officers who joined the chase at distinct times), *reh'g denied*, *summarily aff'd in relevant part*, 753 N.E.2d 1284, 1288 (Ind. 2001), *reh'g denied*.

[43] Because I believe only one flight occurred, I would vacate one of Cupp's convictions of resisting law enforcement. *See id.* (vacating two of three convictions of resisting law enforcement because defendant's "acts in resisting law enforcement after he exited the bank and during the ensuing chase similarly arose from a single incident"). Therefore, I dissent from the second part of the majority's analysis. Because I would hold there was only one act of resisting, my analysis of the sufficiency issue would be different from the majority's analysis, but I concur that the evidence was sufficient to find Cupp resisted Officer Thomas. Finally, I concur in full with the majority's resolution of the firearms enhancement issue. Accordingly, I dissent in part, concur in result in part, and concur in full in part.