# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 10 2019, 8:50 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Brian Woodward
Public Defender's Office
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Rolando Manuel Leal, Jr.,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

June 10, 2019

Court of Appeals Case No.
18A-CR-2161

Appeal from the Lake Superior Court

The Honorable Samuel L. Cappas, Judge

Trial Court Cause No.
45G04-1703-MR-3

**Najam, Judge.**

# Statement of the Case

Rolando Manuel Leal, Jr. appeals his adjudication under Indiana's criminal organization enhancement statute, Indiana Code Section 35-50-2-15 (2018), which required the State to prove that he had committed a felony offense while he was knowingly or intentionally a member of a criminal organization and that he had committed the offense at the direction of or in affiliation with a criminal organization. Leal presents one issue for our review, namely, whether the State presented sufficient evidence to support his adjudication under that statute.

We affirm.

# Facts and Procedural History

Leal is a member of the Imperial Gangster Renegades ("IG Renegades"), a gang based in northwest Indiana. Rito Maciel, Jr. and Angel Garcia-Berrios are members of the Two Six Renegades gang, which is also based in northwest Indiana. On January 24, 2016, Leal and Maciel met up with Garcia-Berrios and went to a bar in East Chicago. While they were at the bar, Maciel received text and Facebook messages from Thaddeus Rodriguez, Jr., who was a member of the Two Six gang, a Chicago-based gang from which the Two Six Renegades

had broken away.[1]  Maciel did not inform Leal and Garcia-Berrios that Rodriguez had contacted him.

[4]  Leal, Garcia-Berrios, and Maciel left the bar at approximately 3:00 a.m. on January 25, and the three men drove around town in Leal's car.  While in the car, Maciel continued to receive messages from Rodriguez.  Leal and Garcia-Berrios discovered that Maciel was communicating with Rodriguez.  The "energy" in the car became a "really, really bad energy," and Leal and Garcia-Berrios wanted to know where Rodriguez was.  Tr. Vol. IV at 105.  Rodriguez's name "kept getting more brought up," so Leal pulled his car over and took two guns out of the door panels.  *Id*.  Leal handed one of the guns, a Smith and Wesson, to Garcia-Berrios.  Leal kept a 9-millimeter Glock for himself, which had "a laser pointer on it."  *Id*. at 106.

[5]  Maciel knew that there was a problem between Garcia-Berrios and Rodriguez because Rodriguez had stolen a necklace from Garcia-Berrios' sister.  Accordingly, Maciel was trying to think of reasons to not meet up with Rodriguez.  However, Leal and Garcia-Berrios "demand[ed]" that Maciel call Rodriguez and put him on speaker phone.  *Id*. at 107.  While on the phone, Rodriguez told Maciel that he was on Olcott Avenue.  At that point, Leal told Maciel and Garcia-Berrios that he "knew a spot to go," and he drove his car to

---

[1]  Similarly, the IG Renegades factioned off of a Chicago-based gang called the Imperial Gangsters.

that location. *Id*. at 109. When they arrived, Leal and Garcia-Berrios got out of the car and told Maciel to stay where he was.

[6] Meanwhile Rodriguez was at the home of his friend, Valare Roman, who lived on Olcott Avenue. At around 5:00 a.m., Rodriguez exited Roman's house. At the same time, Jose Acosta was also standing outside of a nearby house. Acosta was on the phone when he saw two men running in his direction. Acosta noticed that both men had guns. He specifically noticed that one of the guns had a red light on it. The man "who had [the gun] with the light" threw Acosta on the ground, hit him, robbed him, and fired three shots at him. Tr. Vol. II at 171. Two of the shots missed Acosta, but one hit Acosta in the leg. The other man approached Rodriguez, beat him, and shot at him multiple times. Rodriguez suffered eight bullet wounds, five of which were fatal. Rodriguez died at the scene, and Acosta was taken to the hospital for treatment.

[7] Roman and other neighbors who had heard the gunshots called 9-1-1. In addition, ShotSpotter Alert[2] informed officers that multiple gunshots had been fired on Olcott Avenue. Officer John Baran with the East Chicago Police Department ("ECPD") responded to the scene. Officer Baran saw Rodriguez on the ground with "a large amount of blood" coming from Rodriguez's head.

---

[2] ShotSpotter Alert is a system that "detects shots that are fired within the city limits," and it "lets [officers] know the location where the shots were fired." Tr. Vol. II at 114.

*Id.* at 115. He also observed multiple shell casings and fragments around the scene. In total, officers recovered nine spent cartridge casings from the scene.

[8] A few weeks later, on February 12, ECPD Detective Francisco Aleman conduced a traffic stop of Luis Perez-Correa. Officers discovered that Perez-Correa was in possession of a 9-millimeter handgun without a license, so they arrested him. A few hours after his arrest, Perez-Correa asked to speak with ECPD Detective Justin Orange, who was the lead investigator of the Rodriguez murder. Perez-Correa told Detective Orange that he had received the handgun from Leal. Perez-Correa further informed Detective Orange that Leal had told him that he needed to get rid of the gun "because it was the weapon that was used on that Thaddeus thing." Tr. Vol. III at 218. Officers with the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") confirmed that shell casings from the gun Perez-Correa had in his possession matched the shell casings recovered from the scene where Rodriguez had been shot.

[9] In March, Maciel accidentally shot himself in the leg. That shooting drew the attention of Detective Stuart Hinson, an ATF task force officer. Detective Hinson conducted two interviews of Maciel. During the second interview, Maciel told Detective Hinson about the events that had occurred on January 25. At some point later, Maciel met up with Leal at a restaurant. During their meeting, Leal told Maciel that he thought he was "in the clear" of "having . . . anything to do with [Rodriguez] getting killed[.]" Tr. Vol. IV at 127. Maciel reported that conversation to Detective Hinson.

[10] The State charged Leal with one count of murder, a felony (Count I); one count of battery, as a Level 5 felony (Count II); and one count of criminal gang activity, as a Level 6 felony (Count III). The State also alleged that, at the time he had committed those offenses, Leal was knowingly or intentionally a member of a criminal organization and that he had committed those felony offenses at the direction of or in affiliation with a criminal organization.

[11] The trial court held a bifurcated jury trial from July 9 through July 12, 2018. During the first phase of the trial, the State presented the testimony of Perez-Correa, who testified that Rodriguez had been "greenlighted" by a gang, which means that the gang had authorized someone to kill him. Tr. Vol. IV at 21. Perez-Correa specifically testified that Rodriguez had been greenlighted because "[s]omething went wrong on a lick that they were supposed to do[.]"[3] Id. at 22. Perez-Correa further testified that Rodriguez was a problem for the Two Six gang.

[12] The State also presented the testimony of Maciel. Maciel testified gangs often form alliances, and that those alliances are fluid, with gang members being able to "pick and choose who they want to get along with" in other gangs. Id. at 89. Maciel also testified that, even though renegades of a gang may start their own faction, "they were still part of the same gang." Id. at 87.

---

[3] A "lick" is "either a robbery or pulling a hit or something." Id. at 36.

[13]     ATF Special Agent Jason Gore also testified at Leal's trial. Special Agent Gore testified that, while the Two Six and the original Imperial Gangsters ("IG") gang did not get along with each other, their respective renegade factions did. He further testified that the Two Six Renegades would "cli[que] up with" the IG Renegades.[4] *Id.* at 199. Special Agent Gore also testified that the punishment for a "problem member" of a gang would range from a beating to murder. *Id.* at 202. Detective Hinson similarly testified that problem members are "dealt with" in a variety of ways, including murder. Tr. Vol. V at 21. Additionally, Detective Hinson testified that the gang alliances in northwest Indiana are "fluid" and that "[p]eople are shifting loyalties and alliances quite often[.]" *Id.*

[14]     At the conclusion of the first phase of the trial, the jury found Leal guilty of Counts I, II, and III. The trial court entered judgment of conviction on Counts I and II but did not enter a judgment on Count III. The trial court then moved to the second phase of the trial. At the end of the second phase, the jury found Leal guilty of the criminal gang enhancement. The trial court entered judgment of conviction accordingly. The court sentenced Leal to fifty-five years for the murder conviction, which the court enhanced by another fifty-five years based on the criminal gang enhancement. The court also sentenced Leal to a

---

[4] In various places, the transcript uses the spelling "clicked up." However, that is a misspelling of the word "cliqued up." *See* Urban Dictionary, https://www.urbandictionary.com/define.php?term=clicked+up (last visited May 31, 2019). And "cliqued up" means "[t]o join with another group or person; the act of being in a group." *See* Urban Dictionary, https://www.urbandictionary.com/define.php?term=cliqued%20up (last visited May 31, 2019). Accordingly, we will use "clique up" and "cliqued up" throughout this opinion.

concurrent term of three years for the battery conviction, for an aggregate sentence of one hundred and ten years. This appeal ensued.

## Discussion and Decision

[15] Leal contends that the State failed to present sufficient evidence to support his adjudication under Indiana's criminal organization enhancement statute.[5] Our standard of review on a claim of insufficient evidence is well settled:

> For a sufficiency of the evidence claim, we look only at the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess the credibility of witnesses or reweigh the evidence. *Id*. We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id*.

*Love v. State*, 73 N.E.3d 693, 696 (Ind. 2017). We apply the same standard when reviewing the sufficiency of the evidence for a sentencing enhancement. *See Woods v. State*, 939 N.E.2d 676, 677 (Ind. Ct. App. 2010) (reviewing the sufficiency of the evidence for a habitual offender determination).

[16] To adjudicate Leal under Indiana's criminal organization enhancement statute, the State was required to prove that Leal had committed the murder while he was knowingly or intentionally a member of a criminal organization and that he had committed the offense at the direction of or in affiliation with a criminal

---

[5] Leal does not appeal his convictions for murder or battery.

organization. Ind. Code § 35-50-2-15(b) (2018). On appeal, Leal asserts that the State failed to present sufficient evidence that he had committed the murder while he was a member of a criminal gang or that he had committed the murder at the direction of or in affiliation with a criminal organization. We cannot agree.

[17] Leal does not dispute that he committed the murder with Garcia-Berrios, who is a Two Six Renegade. At trial, Detective Hinson and Maciel both testified that alliances are "fluid" and that "[p]eople are shifting loyalties and alliances quiet often[.]" Tr. Vol. V at 21. Further, Special Agent Gore testified that the Two Six Renegades and the IG Renegades "clic[que] up" with each other. Tr. Vol. IV at 197. And Maciel testified that renegade factions would "clique up" to help each other take care of problems. *Id*. at 89. In other words, both Special Agent Gore and Maciel testified that renegade factions would join together and form alliances from time to time in order to help each other. Based on that evidence, a reasonable jury could conclude that Leal, while an IG Renegade, had "cliqued up" with Garcia-Berrios and the Two Six Renegades.

[18] Further, Maciel testified that, even if a person is part of the renegade faction, that person is still part of the same gang. Because the State presented evidence that Leal had "cliqued up" with the Two Six Renegades, the State also presented evidence that Leal was affiliated with the Two Six gang. Similarly, the State presented evidence that Garcia-Berrios, as a Two Six Renegade, was also part of the Two Six gang.

[19]     At trial, Perez-Correa testified that Rodriguez was a "problem" for his gang, the Two Six. Tr. Vol. IV at 36. He further testified that Rodriguez had been "greenlighted," which means that "anyone can kill you." *Id*. at 21. In addition, both Special Agent Gore and Detective Hinson testified that problem members are "dealt with" in a variety of ways, including murder. Tr. Vol. V at 21. Based on that evidence, a reasonable jury could conclude that Garcia-Berrios, a member of the Two Six gang, and Leal, who had "cliqued up" with Garcia-Berrios, had murdered Rodriguez at the direction of or in affiliation with the Two Six gang in order to take care of a problem.

[20]     Still, Leal asserts that the State failed to present sufficient evidence to demonstrate that the criminal organization enhancement applies because there is no evidence that the IG Renegades is a criminal organization. But whether the IG Renegades is a criminal organization is irrelevant to the question on appeal. As discussed above, Leal had "cliqued up" with the Two Six Renegades to help Garcia-Berrios murder Rodriguez. And Leal does not dispute that the Two Six Renegades is a criminal organization. He further contends that the State failed to present sufficient evidence to demonstrate that the supposed new gang he had formed with Garcia-Berrios had at least three members. But, as discussed above, Leal and Garcia-Berrios did not murder Rodriguez as members of a new gang but, rather, they murdered Rodriguez while affiliated with the Two Six gang.

[21]     In sum, the State presented evidence that Leal had "cliqued up" with the Two Six gang to help Garcia-Berrios murder another member of the Two Six gang

who had been "greenlighted." Leal's contentions on appeal are simply requests that we reweigh the evidence, which we cannot do. The State presented sufficient evidence to demonstrate that Leal murdered Rodriguez while a member of a criminal organization and at the direction of or in affiliation with a criminal organization. We therefore affirm Leal's adjudication under the criminal organization enhancement statute.

Affirmed.

Pyle, J., and Altice, J., concur.