## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 16 2020, 8:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

J. Michael Woods
Stracci Law Group, P.C.
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Luciano Galvan, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | December 16, 2020 <br><br> Court of Appeals Case No. 20A-CR-520 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Salvador Vasquez, Judge <br><br> Trial Court Cause No. 45G01-1809-F3-99 |

**Pyle, Judge.**

# Statement of the Case

Luciano Galvan ("Galvan") appeals his conviction by jury of Level 3 felony rape.[1] He argues that: (1) the trial court abused its discretion in admitting evidence; (2) the trial court abused its discretion in instructing the jury; and (3) there is insufficient evidence to support his conviction. Finding no abuse of the trial court's discretion and sufficient evidence to support the conviction, we affirm Galvan's conviction for Level 3 felony rape.

We affirm.

# Issues

1. Whether the trial court abused its discretion in admitting evidence.

2. Whether the trial court abused its discretion in instructing the jury.

3. Whether there is sufficient evidence to support Galvan's conviction for Level 3 felony rape.

# Facts

The facts most favorable to the verdict reveal that on September 8, 2018, twenty-three-year-old C.M. ("C.M.") and several friends, including C.M.'s roommate, Chandler Saints ("Saints"); Saint's boyfriend, Nicholas Obregon ("Obregon"); Brad Kieltyka ("Kieltyka"); and Galvan, attended another

---

[1] IND. CODE § 35-42-4-1.

friend's birthday party. While at the party, the group drank alcohol. After the birthday party ended at approximately 1:00 a.m., the group went to Obregon's house, where they continued to drink alcohol.

[2] By the early morning hours of September 9, 2018, C.M. was so intoxicated that she could not stand up. Galvan and Kieltyka took C.M. outside to get some fresh air and eventually decided to take C.M. home and put her to bed. The two men drove C.M. to the apartment that she shared with Saints.

[3] When Galvan and Kieltyka arrived at C.M.'s apartment, the two men placed C.M. on her bed. They did not remove her clothes or cover her with a blanket. As Kieltyka started to leave, Galvan told him that he was going to stay with C.M. and "take care of her." (Tr. Vol. 4 at 25). Kieltyka left Galvan at C.M.'s apartment and returned to the party at Obregon's house.

[4] Forty-five minutes later, concerned that Galvan had not returned to the party, Kieltyka drove back to C.M.'s apartment. As Kieltyka approached the building's front door, Galvan exited the building. Kieltyka asked Galvan what he had been doing at C.M.'s apartment, and Galvan responded that "he had [had] sex with [C.M.]" (Tr. Vol. 4 at 31).

[5] Saints, who returned to the apartment that she shared with C.M. shortly after 5:00 a.m., discovered C.M. "laying on her back on her bed with her shirt up above her bra and a blanket over her, and she didn't have any pants on, and there was – and her tampon was on the bed across from her like it had been taken out." (Tr. Vol. 4 at 58). Saints attempted to wake C.M., who was

unresponsive. Saints then texted Galvan and asked, "Why did you do this[?]" (Ex. Vol. at 115). Galvan responded, "[d]o what[?]" (Ex. Vol. at 115). Saints replied, "[s]omebody definitely had sex with her. They said you stayed behind." (Ex. Vol. at 115). Galvan responded that he had "stayed behind . . . to get everything situated." (Ex. Vol. at 115).

[6] When C.M. woke up at noon, she was unable to remember what had happened the previous night. Saints telephoned Galvan, who told her that he and Kieltyka had taken C.M. back to her apartment, placed her on her bed, and left the apartment. When C.M. got on the telephone, Galvan told her the same thing that he had told Saints. After hanging up the phone, C.M. told Saints, "you know when someone sounds like they're full of shit? This is one of those moments." (Tr. Vol. 5 at 221). C.M. then left the room and vomited.

[7] About ten minutes later, Galvan called C.M. and told her that "he didn't know how to handle the situation because he'd never been in a situation before and that he didn't want . . . any of it to get out to his girlfriend [but] that he had [had] sex with [C.M.] for just three minutes [and] that was it." (Tr. Vol. 5 at 223). C.M. asked Galvan if he had been coherent and had known what he was doing, and Galvan responded that he had. C.M. began crying and then went back to sleep because she "didn't want it to be true." (Tr. Vol. 5 at 224).

[8] Saints and Galvan subsequently spoke on the telephone again. Galvan told Saints that he "was crying and shaking" and that "he was sorry." (Tr. Vol. 4 at

71). At some point that day, Galvan sent the following text to a group chat that included Obregon and three other friends:

> I had sex with [C.M.] last night and she was blacked out and I was starting to lose my coherence and I just feel like dying honestly. [Saints] called asking what happened and I didn't tell her everything because I was scared to. [C.M.] asked me what happened and I didn't tell her either because I was so scared. I couldn't keep it a secret and knew it was horrible to keep it from her so I told her and she literally hates me now and I don't blame her…. I'm so sorry guys I'm like crying right now and my hands are shaking[.] [I] feel worthless[.]

("the Group Text") (Ex. Vol. at 51) .

[9] When C.M. woke up later that evening, she contacted the Whiting Police Department to report that she had been raped. Saints and Obregon were with C.M. when police officers arrived at the apartment, and Obregon showed the officers the Group Text.

[10] Responding police officers collected the jeans that C.M. had been wearing when Galvan and Kieltyka had brought her home. One of the officers noticed that the jeans were tangled with C.M.'s underwear "like . . . when somebody had taken them off, it appeared that like the underwear came off with the jeans." (Tr. Vol. 4 at 115). The officers also collected the underwear and a shirt.

[11] A police officer escorted C.M. to the hospital, where C.M. was examined by a nurse. The nurse used a sexual assault evidence kit to collect swabs from

C.M.'s internal and external genitalia. The nurse also took a swab of a dried secretion between C.M.'s breasts. When the nurse asked C.M. if she had engaged in any consensual sexual activity within the preceding five days, C.M. responded that she had not.

[12]     A forensic DNA analyst at the Indiana State Police Lab examined C.M.'s jeans, underwear, shirt, and bra. The analyst determined that Galvan's DNA was present on "the inside nipple areas of [C.M.'s] bra." (Tr. Vol. 5 at 118). In addition, the analyst determined that there was male DNA on the crotch of C.M.'s underwear and jeans. However, there was not enough DNA present for further analysis as to the identity of the male.

[13]     The analyst also examined the swabs taken from C.M. at the hospital. The analyst determined that male DNA was present on the swab of C.M.'s external genitalia. Again, there was not enough DNA present for further analysis as to the identity of the male. C.M.'s internal genital swab was presumptively positive for blood but there was no male DNA detected. The analyst explained that C.M.'s menstrual cycle, which had begun two days before the swabs were taken, would have "help[ed] remove a lot of – any foreign DNA that might [have] be[en] present in that area." (Tr. Vol. 5 at 108). The dried secretion swab taken from between C.M.'s breasts contained C.M.'s DNA and the DNA of an unknown person.

[14]     The State charged Galvan with rape on September 21, 2018, and Galvan's jury trial began in January 2020. The jury heard testimony about the facts as set

forth above. When the State asked Kieltyka what Galvan had told him when Kieltyka had asked Galvan what he had been "doing in [C.M.'s apartment] for so long," Galvan objected on the basis of *corpus delicti*.[2] (Tr. Vol. 4 at 30). The trial court overruled the objection, and Kieltyka testified that Galvan had "told [him] that he had had sex with [C.M.]" (Tr. Vol. 4 at 31). In addition, when the State asked a police officer about the Group Text that Obregon had shown him when the officer had been at C.M.'s apartment, Galvan again objected on the basis of *corpus delicti*. The trial court again overruled the objection and admitted the Group Text into evidence. Galvan did not object to C.M.'s testimony that Galvan told her that he had had sex with her.

[15] Following the presentation of evidence, Galvan tendered to the trial court a lesser-included offense instruction for Class B misdemeanor battery. The State objected to the instruction, and the trial court declined to give it. The jury convicted Galvan of Level 3 felony rape, and the trial court sentenced him to nine (9) years in the Department of Correction.

[16] Galvan now appeals his conviction.

# Decision

[17] Galvan argues that: (1) the trial court abused its discretion in admitting evidence; (2) the trial court abused its discretion in instructing the jury;

---

[2] The corpus delicti rule provides that a crime cannot be proven only on the basis of a confession. *Shinnock v. State*, 76 N.E.3d 841 (Ind. 2017).

and (3) there is insufficient evidence to support his conviction. We address each of his contentions in turn.

## 1. Admission of Evidence

Galvan first argues that the trial court abused its discretion in admitting evidence. The admission of evidence is within the sound discretion of the trial court, and we will reverse only for an abuse of that discretion. *Rogers v. State*, 897 N.E.2d 955, 959 (Ind. Ct. App. 2008), *trans. denied*. A trial court abuses its discretion if its decision is clearly against the logic and the effect of the facts and circumstances before the court or if the court has misinterpreted the law. *Id.*

Galvan specifically argues that the trial court abused its discretion in admitting into evidence: (1) his statement to Kieltyka that he had had sex with C.M.; and (2) the Group Text. According to Galvan, "the balance of the evidence in the record was insufficient to establish the *corpus delicti* of the crime charged – specifically rape . . . [because] there is no independent evidence from which the crime of rape c[ould] be inferred." (Galvan's Br. 5, 12). The State responds that "eyewitness and physical evidence in this case amply support such an inference." (State's Br. 15). We agree with the State.

> In Indiana, a person may not be convicted of a crime based solely on a nonjudicial confession of guilt. Rather, independent proof

of the *corpus delicti* is required before the defendant may be convicted upon a nonjudicial confession. Proof of the *corpus delicti* means proof that the specific crime charged has actually been committed by someone. Thus, admission of the confession requires some independent evidence of commission of the crime charged. The independent evidence need not prove that a crime was committed beyond a reasonable doubt, but merely provide an inference that the crime charged was committed. The inference may be created by circumstantial evidence.

*Shinnock*, 76 N.E.3d at 843 (quotations and citations omitted).

[20] Here, Galvan was charged with Level 3 felony rape. Thus, the State had to prove that he knowingly or intentionally had sexual intercourse with C.M. or intentionally caused C.M. to perform or submit to other sexual conduct when C.M. was unaware that the sexual intercourse or other sexual conduct was occurring. *See* IND. CODE § 35-42-4-1. Sexual intercourse is an act that includes any penetration of the female sex organ by the male sex organ. IND. CODE § 35-31.5-2-302. The statute does not require that the vagina be penetrated, only that the female sex organ, including the external genitalia, be penetrated. *Smith v. State*, 779 N.E.2d 111, 115 (Ind. Ct. App. 2002), *trans. denied*.

[21] Galvan "concedes that a review of the caselaw demonstrates that Indiana courts have rarely found lack of *corpus delicti* for purposes of admitting a confession[,]" and we find no such lack in this case. (Galvan's Br. 11). Specifically, our review of the evidence reveals that Galvan and Kieltyka took an extremely intoxicated C.M. to her apartment and placed her in bed. They did not remove

her clothes or place a blanket over her.  After Kieltyka had left, Galvan stayed at the apartment with C.M. for an additional forty-five minutes.  Thereafter, Saints discovered C.M. lying in bed with her shirt up above her bra.  C.M. was not wearing any pants, and she had a blanket on her.  There was also a tampon on her bed "like it had been taken out." (Tr. Vol. 4 at 58).  Based on what she saw, Saints believed that "[s]omebody definitely had [had] sex with [C.M.]" (Ex. Vol. at 115).  C.M. and Saints both spoke with Galvan on the telephone, and Galvan eventually told C.M. that he did not want his girlfriend to find out but that he "had [had] sex with [C.M.]" (Tr. Vol. 5 at 223).  Galvan also told C.M. that he had known what he was doing.

[22]  When police officers arrived at C.M.'s apartment, the officers noticed that C.M.'s jeans were tangled with C.M.'s underwear "like . . . when somebody had taken them off, it appeared that like the underwear came off with the jeans." (Tr. Vol. 4 at 115).  In addition, a forensic analyst found Galvan's DNA on "the inside nipple areas of [C.M.]'s bra." (Tr. Vol. 5 at 118).  The analyst also found male DNA on C.M.'s external genitalia and on the crotch of her jeans and underwear.  C.M. had not had consensual sexual relations in the preceding five days.  This evidence provides an inference that the crime of rape had been committed, and the trial court did not abuse its discretion in admitting Galvan's statement to Kieltyka and the Group Text into evidence.

## 2.  Jury Instructions

[23]     Galvan next argues that the trial court abused its discretion in instructing the jury. Galvan specifically contends that the trial court abused its discretion when it declined to give his tendered lesser-included offense instruction for battery as a Class B misdemeanor.

[24]     In *Wright v. State*, 658 N.E.2d 563, 566 (Ind. 1995), the Indiana Supreme Court set forth a three-part test that trial courts should perform when called upon by a party to instruct the jury on a lesser-included offense to the crime charged. First, the trial court must compare the statute defining the crime charged with the statute defining the alleged lesser-included offense to determine if the alleged lesser-included offense is inherently included in the crime charged. *Id*. Second, if the trial court determines that an alleged lesser-included offense is not inherently included in the crime charged under step one, then it must determine if the alleged lesser-included offense is factually included in the crime charged. *Id.* at 567. If the alleged lesser-included offense is neither inherently nor factually included in the crime charged, the trial court should not give an instruction on the alleged lesser-included offense. *Id.* Third, if a trial court has determined an alleged lesser-included offense is either inherently or factually included in the crime charged, "it must look at the evidence presented in the case by both parties" to determine if there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense and if, in view of this dispute, a jury could

conclude that the lesser offense was committed but not the greater. *Id.* It is reversible error for a trial court not to give a requested instruction on inherently or factually included lesser offenses if there is such an evidentiary dispute. *Id.* We now apply this framework to the tendered lesser-included offense instruction in this case.

[25] Battery is an inherently included lesser offense of rape. *Angle v. State*, 698 N.E.2d 356, 359 (Ind. Ct. App. 1998). The only element distinguishing the two offenses is sexual intercourse. *Id*. Specifically, Class B misdemeanor battery occurs when a person knowingly or intentionally touches another person in a rude, insolent, or angry manner. IND. CODE § 35-42-2-1. Rape, on the other hand, occurs when a person knowingly or intentionally has sexual intercourse with another person or intentionally causes another person to perform or submit to other sexual conduct. I.C. § 35-42-4-1. Where there is no serious evidentiary dispute about whether Galvan had sexual intercourse with C.M., Galvan is not entitled to the lesser-included battery instruction. *See Gale v. State*, 882 N.E.2d 808, 815 (Ind. Ct. App. 2008) (affirming the trial court's denial of defendant's request for a lesser-included battery instruction where there was no serious evidentiary dispute about whether defendant had sexual intercourse with the victim).

[26] Here, we find no such serious evidentiary dispute. Specifically, our review of the evidence reveals that, as previously discussed, Galvan and Kieltyka took an extremely intoxicated C.M. to her apartment and placed her in bed. They did not remove her clothes or place a blanket over her. After Kieltyka had left, Galvan stayed at the apartment with C.M. for an additional forty-five minutes. When Kieltyka went back to C.M.'s apartment and asked Galvan what he had been doing at C.M.'s apartment, Galvan responded that he had "had sex with C.M." (Tr. Vol. 4 at 31).

[27] Thereafter, Saints discovered C.M. lying in bed with her shirt up above her bra. C.M. was not wearing any pants and she had a blanket over her. There was also a tampon on her bed "like it had been taken out." (Tr. Vol. 4 at 60). Based on what she saw, Saints believed that "[s]omebody definitely had [had] sex with [C.M.]" (Ex. Vol. at 115). C.M. and Saints both spoke with Galvan on the telephone, and Galvan eventually told C.M. that he did not want his girlfriend to find out but that he had "had sex with [C.M.]" (Tr. Vol. 5 at 223). In addition, Galvan told C.M. that he had known what he was doing. Galvan then sent the Group Text to four friends telling them that he had "had sex with [C.M.] [when] she was blacked out." (Ex. Vol. at 51).

[28] When police officers arrived at C.M.'s apartment, the officers noticed that C.M.'s jeans were tangled with C.M.'s underwear "like . . . when somebody had taken them off, it appeared that like the underwear came off with the jeans." (Tr. Vol. 4 at 115). In addition, a forensic analyst

found Galvan's DNA on "the inside nipple areas of [C.M.]'s bra." (Tr. Vol. 5 at 118). The analyst also found male DNA on C.M.'s external genitalia and on the crotch of her jeans and underwear. C.M. had not had consensual sexual relations in the preceding five days. Because there is no serious evidentiary dispute about whether Galvan had sexual intercourse with C.M., the trial court did not abuse its discretion when it refused Galvan's tendered instruction on the lesser-included offense of Class B misdemeanor battery. *See Gale*, 882 N.E.2d at 815.

### 3. Sufficiency of the Evidence

[29] Galvan also argues that there is insufficient evidence to support his conviction for Level 3 felony rape. Our standard of review for sufficiency of the evidence claims is well-settled. We consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not reweigh the evidence or judge witness credibility. *Id.* We will affirm the conviction unless no reasonable fact finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* The evidence is sufficient if an inference may be reasonably drawn from it to support the verdict. *Id.* at 147.

[30] As previously discussed, in order to convict Galvan of Level 3 felony rape, the State had the burden to prove beyond a reasonable doubt that Galvan knowingly or intentionally had sexual intercourse with C.M. or intentionally

caused C.M. to perform or submit to other sexual conduct when C.M. was unaware that the sexual intercourse or other sexual conduct was occurring. *See* I.C. § 35-42-4-1. Sexual intercourse is an act that includes any penetration of the female sex organ by the male sex organ. I.C. § 35-31.5-2-302. The statute does not require that the vagina be penetrated, only that the female sex organ, including the external genitalia, be penetrated. *Smith*, 779 N.E.2d at 115.

[31] Here, our review of the evidence, as set forth in the issues above, is sufficient to support Galvan's conviction for Level 3 felony rape. Accordingly, we affirm Galvan's rape conviction.

[32] Affirmed.

Kirsch, J., and Tavitas, J., concur.